Docket No. 90282.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
ROBERT D. JONES, Appellant.

*Opinion filed January 20, 2006.*

JUSTICE FITZGERALD delivered the judgment of the court, with opinion.

Chief Justice Thomas concurred in the judgment and opinion.

Justice McMorrow, specially concurred, joined by Justice Freeman.

Justice Kilbride concurred in part and dissented in part, with opinion.

Justices Garman and Karmeier took no part in the decision.

## OPINION

This appeal arises from the second trial of defendant, Robert D. Jones, for the murder of Dr. Henry Dickerman, Jr. Defendant was charged and later found guilty of first degree murder (720 ILCS 5/9–1 (West 1996)) following a jury trial in 1996 in the circuit court of Sangamon County. Defendant appealed, and the appellate court remanded for a new trial. *People v. Jones*, 294 Ill. App. 3d 1125 (1998) (unpublished order under Supreme Court Rule 23). On remand, following a second jury trial, defendant was again found guilty of first degree murder. Defendant appealed, and the appellate

court affirmed, with one justice dissenting. 315 Ill. App. 3d 500.

Defendant appealed to this court, arguing that (1) the trial court improperly ruled on a motion for substitution of judge; (2) the trial court failed to bar statements made during the course of plea negotiations; (3) the trial court erred by refusing to instruct the jury on involuntary manslaughter; (4) the State failed to prove a material element of the crime–namely, venue; (5) the trial court improperly allowed the State to amend the charges against him; and (6) *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), required that his conviction be overturned.

On September 20, 2001, we filed an opinion reversing the trial court and the appellate court with respect to the first issue; we remanded to the trial court for a hearing on defendant's motion for substitution of judge for cause. *People v. Jones*, 197 Ill. 2d 346 (2001). We did not reach the other issues raised in defendant's appeal. We retained jurisdiction and directed that the trial court report its findings, after hearing defendant's substitution motion, to the clerk of this court within 90 days of the issuance of the mandate. We have been advised that the trial court has conducted a hearing on defendant's motion, has concluded that no cause exists to support a substitution of judge, and has denied defendant's motion. We granted defendant leave to supplement his brief on this issue. In his supplemental brief, defendant maintains that cause exists to support his motion for substitution of judge. We now address defendant's arguments on appeal.


BACKGROUND

Defendant was first convicted of the first degree murder of Dr. Dickerman after a jury trial in August 1996 and was sentenced to 85 years' imprisonment. On appeal, defendant argued that the trial court erroneously admitted into evidence a written statement he made to the police on August 15, 1994. Particularly, on August 15, 1994, police detectives visited with defendant while he was incarcerated. Defendant, as directed by the detectives, hand drafted a two-page statement providing the terms of the deal he would be willing to accept in order to plead guilty. The detectives informed defendant that the statement was for the State's Attorney. This statement was read into evidence at trial. The appellate court agreed that the

statement contained the "rudiments of the negotiation process" and, therefore, was an inadmissible plea-related statement under Rule 402(f) (177 Ill. 2d R. 402(f)). The appellate court reversed defendant's conviction and remanded for a new trial. *People v. Jones*, 294 Ill. App. 3d 1125 (1998) (unpublished order under Supreme Court Rule 23).

On remand, prior to the start of the new trial, defendant filed a motion for automatic substitution of judge pursuant to section 114‒5(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/114‒5(a) (West 1998)). The trial judge denied the motion as untimely. Subsequently, defendant filed a motion for substitution of judge for cause pursuant to section 114‒5(d) of the Code (725 ILCS 5/114‒5(d) (West 1998)). Defendant argued that Judge Zappa, the original trial judge and trial judge on remand, was prejudiced against him, and that this prejudice was evident in his pretrial rulings during the first trial and his comments during sentencing. Judge Zappa heard the motion, and denied the motion as untimely.

Defendant then filed a motion to suppress statements he made to the police on July 27, 1994, and August 16, 1994. The trial judge denied the motion on the basis that the statements were admitted against defendant in the first trial and defendant failed to challenge the admissibility of those statements on appeal. He held that defendant's failure to challenge the statements precluded a later challenge on remand. The matter proceeded to trial a second time, and the record reveals the following.

In June 1992, defendant approached Dr. Dickerman, a single 85-year-old man and retired surgeon, with a proposal to paint his house and do various minor repairs. Dr. Dickerman agreed, hired defendant, and paid a sum up front with a remainder to be paid at the completion of the work. Ultimately, the scope of defendant's duties expanded, and he worked as a handyman for Dr. Dickerman doing various repair work as it was needed.

At approximately the same time, in July 1992, for a period of six weeks, defendant additionally worked for Tri-State Foods. When he began as an employee for Tri-State, defendant informed the manager that he would do additional work if the manager advanced him money to buy the necessary supplies to complete the job. The manager agreed and advanced defendant money. Defendant failed to

repay the money by the end of July, as agreed, and he was contacted by an attorney. On August 4, defendant delivered part of the money he owed, $850, in cash to the manager with a promise to repay the remainder shortly.

On August 11, 1992, Dr. Dickerman arrived at the Department of Rehabilitation Services, where he worked as a consultant reviewing federal disability claims. Individuals in the office testified that Dr. Dickerman seemed himself and appeared in good health. Dr. Dickerman then met several friends for lunch, and each of those who attended lunch testified that he was in good spirits and appeared to be in good health. The lunch ended at 1:15 p.m.

Charles Rutschke, a United States Postal Service worker, testified that on August 11 he delivered the mail to Dr. Dickerman's house at approximately 4 p.m. Rutschke recalled that the house had a front-door mail slot. While delivering mail on August 11, he was greeted halfway up Dr. Dickerman's walkway by defendant. Rutschke stated that defendant appeared anxious. Defendant asked whether there was any mail for Dr. Dickerman. Rutschke testified that he refused to give defendant the mail and instead placed the mail into the front-door mail slot.

On August 12, 1992, Dr. Dickerman failed to appear at his weekly Wednesday evening bridge game. Concerned friends went to his home to check on him. Upon their initial search of the home everything appeared normal, except that Dr. Dickerman's 1988 Buick Century was not parked in the garage. The police released a description of Dr. Dickerman and his car.

Soon afterwards the police discovered that several of Dr. Dickerman's checks were missing from his checkbook, and that defendant had deposited three checks on August 4, 7, and 8 totaling $5,025 against Dr. Dickerman's account. The police attempted to contact defendant at the address and the telephone number listed on the back of the cashed checks. Detectives left messages on the answering machine at the listed number and later learned that the number was registered to defendant's mother-in-law. Defendant was informed by his mother-in-law that the police were looking for him, and he immediately left the state. Defendant's wife eventually delivered a handwritten note from defendant addressed to the deputy chief of investigations in Sangamon County. The note stated:

"I, Robert Jones, would like to make this statement to assist you in effort to locate Mr. Dickerman. The last time I seen him was on Tuesday afternoon, He left his house at about 4:00 p.m. and said he was going to a dinner with his friends. I did not leave his house until around 4:30 p.m. because I was finishing an interior painting job.

Any checks I received from Mr. Dickerman were written from him to me. I have no idea about the numbers of these checks, I did not pay attention to that. I can tell you that I had nothing to do with his disappearance.

I have had some trouble in the past, but I have tried to put my life on the right track and anyone who knows me as a person knows I could never harm a fly.

\* \* \*

I am not trying to avoid you because I miss my family, but I've been beat up by the system before. Believe me, I will assist you in any way I can to help bring an end of this nightmare that is happening to me all over again.

I hope Mr. Dickerman comes home soon for all of our sakes.

Thank you, Robbie Jones."

A crime scene investigator with the Illinois State Police testified that on September 1, 1992, while Dr. Dickerman was still "missing," he searched his house. The crime scene investigator discovered bloodspatters on the bathroom wall, window sill, and rug. He returned on September 2, 1992, and discovered additional bloodspatters he had previously missed. Investigators could not determine when the blood was deposited and could only testify that the blood on the rug matched Dr. Dickerman's DNA. Stains found on the wall and window sill were insufficient for comparison.

Tina Clark testified that for seven years she cleaned Dr. Dickerman's house every Thursday. She testified that she last cleaned Dr. Dickerman's entire house August 6, 1992. She stated that she washed his bathroom tub and sink, washed the walls around the bathtub, and scrubbed the floors in the upstairs bathroom. On August 6, 1992, she did not notice any blood on the walls or the rug.

On September 5, 1992, hikers found Dr. Dickerman's partially

decomposed body at the bottom of a cliff in Missouri. His car was later located in Lambert-St. Louis International Airport's long-term parking lot. A forensic pathologist determined that the cause of death was homicide.

Defendant returned to Springfield, Illinois, on October 5, 1992, and was arrested. On October 6, Frank Wright, an agent with the Federal Bureau of Investigation (FBI), and Springfield police detective Tim Young interviewed defendant, with his attorney present, about his involvement in Dr. Dickerman's disappearance.[1] Defendant explained that he last saw Dr. Dickerman on August 11, at 2 p.m., when they watched the Chicago Cubs baseball game on television. He said the doctor was dressed in a dinner jacket and slacks and mentioned that he had dinner plans with friends. After Dr. Dickerman left, defendant said, he finished painting the dining room at 4:30 p.m., locked up the house and left. He spent the remainder of the evening with his wife, three daughters, and mother-in-law. He further said that he spent most of the next day in Peoria, Illinois, at a bar and gambling on a river boat casino. He said that, after gambling, he returned to Springfield at approximately 3:30 p.m., changed into his work clothes at a friend's home to conceal the fact of his gambling from his wife, and returned home for the evening. Defendant said he fled to Alabama on August 14 after receiving the answering machine messages from the police concerning cashed checks. Defendant stated that he feared the police would learn about his parole violation for an earlier Indiana offense. Agent Wright and Detective Young additionally questioned defendant about paintings and foreign gold coins missing from the doctor's home. Defendant stated that Dr. Dickerman gave him the paintings, and that he subsequently "pawned" them in an antique shop. He also said that Dr. Dickerman gave him the coins for his children, but he did not recall what he did

---

[1]The Springfield division of the FBI initially participated in the investigation at the request of the Springfield police department because investigators initially believed that Dr. Dickerman's disappearance was the result of a kidnapping.

with the coins. Ultimately, defendant was charged and pleaded guilty to forgery and was imprisoned.

Defendant spoke a second time with the agent for the FBI and Detective Young several days later and repeated his same story. He reiterated that he last saw Dr. Dickerman when the doctor left the house to meet friends for dinner.

On July 12, 1993, at Graham Correctional Center, detectives spoke again with defendant to confront him about the accuracy of his earlier statement. Defendant informed the detectives that "eighty-percent of his earlier statement was true."

One year later, on July 27, 1994, pursuant to defendant's request, he again met with Springfield police detectives. At the time, defendant was incarcerated for his forgery conviction at Big Muddy Correctional Center. Defendant requested an audiotaped interview, and pursuant to his request Springfield detectives Young and Doug Williamson tape-recorded the interview. Detectives, also pursuant to defendant's request, brought a note from the State's Attorney describing the punishments for involuntary manslaughter and first degree murder. When taping began, detectives advised defendant of his *Miranda* rights and noted that the meeting occurred at defendant's request to discuss his actions on August 12, the day after Dr. Dickerman disappeared. When asked whether his October 1992 statement to the police regarding his August 12 conduct was accurate, defendant instructed the detectives to turn off the tape recorders. Thereafter, for a 55-minute period while the tape recorders remained off, defendant admitted that he had fabricated his alibi in his October 1992 statement. Defendant repeatedly asked the detectives to tell him what evidence they had in the case. Defendant asked whether the detectives thought that Dr. Dickerman was murdered, defendant asked about the autopsy report, and despite never being told by the detectives about blood found in the house, defendant asked about blood found in Dr. Dickerman's bathroom. When the detectives told defendant that they were not going to give him any information, he became frustrated, eventually blurting out, "I know you don't have the murder weapon."

When recording resumed, defendant provided a new statement lasting approximately 17 minutes. Defendant informed the detectives that Dr. Dickerman discovered his forgeries earlier in the week of

August 11, 1992. Defendant said that Dr. Dickerman agreed not to press charges if defendant would perform additional work around the house to pay off his debt. When defendant arrived at Dr. Dickerman's house on August 11, 1992, he found Dr. Dickerman lying on the floor of his living room, unconscious, with a spot of blood on his head. He said that his attempts to revive Dr. Dickerman failed. Defendant told detectives that he was afraid he would be implicated in Dr. Dickerman's death because he had forged checks, so he fled the house and returned the next day to dispose of the body. The next day, he gathered Dr. Dickerman's clothes, medicine, glasses, and checkbook, to make it look like Dr. Dickerman left for a trip, placed Dr. Dickerman in the trunk of his car, drove the car to a deserted area near St. Louis, and threw the body over an embankment. He denied killing Dr. Dickerman.

Detectives Young and Williamson met again with defendant on August 3, 1994, at the Franklin County jail in Benton, Illinois, in order to provide defendant with a transcribed copy of their taped discussion occurring on July 27, 1994. Defendant simultaneously listened to the tape and read the transcript. Afterwards defendant signed the transcript, indicating that the transcript was a true and correct copy of his discussion on July 27, 1994. The transcribed copy is several pages in length and contains no reference to any inquiry regarding a bargain for his cooperation. Detectives testified that on August 3, 1994, after signing the transcript, defendant suggested he would be willing to plead guilty to a lesser offense to reduce his sentence. The detectives informed defendant that they were not authorized to negotiate with defendant, but they indicated that they would take his message to the State's Attorney.

On August 16, 1994, while defendant was still incarcerated at Big Muddy Correctional Center, Detectives Williamson and Cox served defendant with an arrest warrant for first degree murder. Defendant was read his *Miranda* rights and indicated that he understood those rights. Detectives also provided defendant a copy of the Illinois Criminal Code of 1961, containing the statutory definition of first degree murder. The detectives informed defendant that if he believed his actions constituted less than first degree murder it would "behoove" him to speak to them.

Defendant informed the detectives that he wished to clarify his

earlier statement. He admitted that his prior statements to the police were false and made a new statement. Defendant told the detectives that he was painting the interior of Dr. Dickerman's house on August 11, 1992, when the mailman arrived. Dr. Dickerman retrieved and opened his mail and discovered that defendant had forged checks. Dr. Dickerman became excited and began screaming at defendant, when he suddenly grabbed his chest, turned away, fell forward, struck his head on the fireplace, then fell to the floor and struck his head a second time on a cloth-covered, brick doorstop. Defendant placed Dr. Dickerman's body in a reclining chair, unlocked the front door, and fled the house. Defendant stated that he had hoped someone would discover the doctor, but he returned early the next morning and discovered the doctor untouched. Defendant decided to dispose of the body and, therefore, gathered some of Dr. Dickerman's personal effects, including his checkbook, clothing, and medicine. Defendant placed the body in the trunk of Dr. Dickerman's car, drove the car past St. Louis where he found a chained-off road, and threw the body over a cliff. Defendant then drove the car to Lambert-St. Louis International Airport, wiped his fingerprints from the interior of the car, and left the car in long-term parking.

Detectives testified that, overall, during their discussions with defendant he was controlling and continually attempting to elicit information from them about the case and their impressions of his involvement in the crime. He often made references to facts about the crime that were never mentioned by the detectives–and refused to tell them how he learned of the information.

Defendant testified in his defense and denied any involvement in Dr. Dickerman's death or the disposal of his body. He testified that on August 11, 1992, he finished painting the interior of Dr. Dickerman's house and received final payment for his work. He stated that at 4 p.m., Dr. Dickerman left the house to meet his friends, and defendant left shortly thereafter to pick up his wife from work. He told the jury that he spent the remainder of the evening with his wife and children. He testified that the next morning, August 12, 1992, he woke up and spent the morning and afternoon on the Peoria river boat casino. He then spent the evening with his wife and children. Defendant continued that on August 13, 1992, he started work on a condominium. He spent the day painting and eventually picked up his wife and children and took them to a motel for a promised "night

out."

Defendant stated that he only spoke to the detectives on July 27 because they threatened to arrest his wife and take away their children. Defendant said the detectives threatened him and gave him the details for his statement, such as where the body was found. Defendant testified that he had "no choice" but to admit to disposing of the body to avoid first degree murder charges.

A jury convicted defendant of first degree murder, and the trial court sentenced defendant to 85 years' imprisonment. Defendant appealed and the appellate court affirmed his conviction. 315 Ill. App. 3d 500.

## ANALYSIS

On appeal, the defendant argues that (1) the trial court improperly ruled on a motion for substitution of judge; (2) the trial court erred when it failed to bar defendant's statements made on July 27 and August 16; (3) the trial court erred by refusing to instruct the jury on involuntary manslaughter; (4) the State failed to prove a material element of the crime–venue; (5) the trial court improperly allowed the State to amend the charges against him; and (6) his sentence violated *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000).

### I. Motion for Substitution of Judge

On November 15, 2001, pursuant to this court's order the trial court conducted a hearing on defendant's motion for substitution of judge (725 ILCS 5/114–5(d) (West 1998)). On remand, the trial court concluded that there was no evidence of prejudice and denied defendant's motion.

In his supplemental brief, defendant continues to allege that the trial judge was prejudiced against him. Defendant complains that this prejudice is evident from the following conduct: the trial judge failed to force the State's compliance with discovery orders, and he negatively commented upon defendant's assertions of prosecutorial misconduct during sentencing, telling defendant he was "outraged" at defendant's accusations against the State's Attorney and the police. We detail these allegations in our opinion remanding this matter to

the trial court for a hearing. See *Jones*, 197 Ill. 2d at 353. Defendant's assertions in his supplemental brief to this court are identical to those argued before the trial court on remand.

In order to prevail, defendant must demonstrate that there are facts and circumstances which indicate that the trial judge was prejudiced. *People ex rel. Baricevic v. Wharton*, 136 Ill. 2d 423, 439 (1990); see also *People v. Mercado*, 244 Ill. App. 3d 1040, 1045-46 (1993). Prejudice is defined as " 'animosity, hostility, ill will, or distrust towards this defendant.' " *People v. Patterson*, 192 Ill. 2d 93, 131 (2000), quoting *People v. Vance*, 76 Ill. 2d 171, 181 (1979); see also *Mercado*, 244 Ill. App. 3d at 1047, quoting *Vance*, 76 Ill. 2d at 181. A movant bears the burden of establishing actual prejudice, not just the possibility of prejudice. *Patterson*, 192 Ill. 2d at 131; see *Mercado*, 244 Ill. App. 3d at 1045. A reviewing court will not disturb a trial court's determination absent a finding against the manifest weight of the evidence. See *Mercado*, 244 Ill. App. 3d at 1047.

Here, the trial court on remand noted that "defendant has failed to assert facts or instances during the second trial which evidence either prejudice or the denial of a fair trial." Further, the trial court determined that Judge Zappa's discovery rulings did not evince prejudice against the State; rather, Judge Zappa held several pretrial hearings and in many instances forced the State to comply with outstanding discovery orders. Last, the trial court held that while Judge Zappa's comments during sentencing were "intemperate," they did not amount to evidence establishing the formation of a fixed anticipatory judgment. Likewise, we find that defendant offers no facts or circumstances to find that Judge Zappa harbored animus toward him or his counsel or was less than evenhanded at the subsequent trial. We find that the trial court's order on remand is not against the manifest weight of the evidence.

## II. The July 27 and August 16 Statements

Defendant maintains that his statements made in 1994, on July 27 and August 16, were plea-related and inadmissible at trial. Defendant acknowledges that he did not challenge the admissibility of these statements in his initial appeal, but he argues that the statements should have been barred on retrial and the trial court erred when it refused to consider his motion to suppress. We disagree. Collateral

estoppel bars the relitigation of an unappealed order absent special circumstances. The present case contains no special circumstances warranting relitigation of the issue.

In *People v. Enis*, 163 Ill. 2d 367, 386 (1994), this court held that where "a defendant's conviction has been reversed for trial error, and the cause is remanded for a new trial, the doctrine of collateral estoppel bars the relitigation of a pretrial ruling, such as a motion to suppress, unless the defendant offers additional evidence or there are other special circumstances." In *Enis*, the defendant was convicted of murder and sentenced to death for that conviction. The defendant challenged the scope of the State's cross-examination of him, and we reversed and remanded for a new trial based on that error. In his first appeal, the defendant did not challenge the trial court's denial of his motions to quash his arrest and suppress evidence. At his second trial, the defendant renewed his motions to quash and suppress. The trial court refused to reconsider its rulings from the first trial, and the defendant was convicted and sentenced to death. On direct appeal, the defendant challenged the trial court's refusal to reconsider its rulings. This court stated:

> "We find no reversible error in the trial court's refusal to reconsider its earlier rulings that denied defendant's motions to quash his arrest and suppress evidence, or the court's denial of defendant's request to exclude evidence of the sexual assault charge filed against the defendant. The defendant could have raised these arguments in his first appeal, and his failure to do so justified the trial court's refusal to reconsider its rulings, under principles of collateral estoppel. *** Defendant does not suggest that he did not receive a full and fair hearing on his pretrial motions. Defendant points to no new evidence or legal precedent that would have been pertinent to the trial court's rulings on these matters. Also, we can find no special circumstances that would have warranted relitigation of defendant's pretrial arguments." *Enis*, 163 Ill. 2d at 386-87.

Our case law does not explicitly define "special circumstances." At common law, however, special circumstances suspended the doctrine of collateral estoppel as a matter of equity where estoppel would result in manifest injustice. See *St. Paul Fire & Marine*

*Insurance Co. v. Downs*, 247 Ill. App. 3d 382, 389 (1993). Illinois courts have found special circumstances warrant relitigation of an earlier ruling when the defendant was denied an opportunity to litigate the issue in his first appeal. In *People v. Mordican*, 64 Ill. 2d 257, 261-62 (1976), we held that under the special-circumstances exception a defendant who unsuccessfully challenged the legality of his arrest, but was acquitted of the charge, may later raise the same argument of the legality of the arrest with respect to separate charges also filed against him because his acquittal prevented appellate review of his motion in the first proceeding. In *People v. Savory*, 105 Ill. App. 3d 1023, 1027-28 (1982), the appellate court reached a similar result. The defendant was charged with two murders after he made a statement to officers and a confession the following day. At his first trial, the trial court denied the defendant's motion to suppress his statement and later confession. On appeal, the defendant challenged the admission of his confession but did not challenge the admission of his statement. The appellate court reversed the defendant's conviction, holding that his confession was involuntary. On retrial, the trial court declined to reconsider its ruling regarding the admissibility of his statement. The appellate court reversed, holding that special circumstances warranted relitigation of the ruling because the "statements which defendant sought to suppress in the second trial were not relied upon by the prosecution in the first trial and, necessarily, the issue of suppression of evidence which could not have contributed to his first conviction would have been considered moot on review in the first appeal." *Savory*, 105 Ill. App. 3d at 1027-28.

Unlike the defendants in both *Mordican* and *Savory*, defendant here was not prevented from raising in his initial appeal the issue he raised on remand at the beginning of his second trial and in this appeal. The record illustrates that defendant was clearly on notice that the statements could have contributed to his first conviction. Specifically, the State used the July 27 and August 16 statements to prosecute defendant in the first trial, and he challenged their admissibility prior to the start of his first trial. However, in his initial appeal defendant did not challenge the admissibility of the July 27 and August 16 statements and acknowledges this fact in his current appeal. Rather, defendant only appealed the admissibility of his August 15 statement in his initial appeal. Thus, the circumstances in

this case more closely resemble those in *Enis*, where we found no special circumstances. Similarly, defendant does not suggest that he did not receive a full and fair hearing on his motions in the initial trial and, further, does not offer new evidence or new legal precedent that would have been important to the trial court at the time of its initial ruling.

The appellate court seems to conclude that "special circumstances" exist to avoid application of the collateral estoppel doctrine in this case because defendant was denied the opportunity to litigate the admissibility of the July 27 and August 16 statements in his first appeal. 315 Ill. App. 3d at 504. According to the appellate court, defendant was denied the opportunity to litigate the admissibility of these statements in his first appeal because the appeal was resolved solely based upon the August 15 statement. 315 Ill. App. 3d at 504 ("It was not necessary for us to address the other two interviews [the July 27 and the August 16 statements] when we decided [defendant's first appeal]").

This is incorrect. The appellate court in the first appeal did not fail to consider the admissibility of the July 27 and August 16 statements because it was "unnecessary" or because resolution of the one issue precluded further review of other issues. Rather, the appellate court did not consider the admissibility of the July 27 or August 16 statements because the defendant *did not challenge* their admissibility in his first appeal. Clearly, this court has never held that a defendant's mere failure to challenge the admissibility of a ruling in the first appeal is a special circumstance sufficient to overcome collateral estoppel.

Furthermore, certainly the trial court was not obligated to reexamine each of its rulings, including any unappealed Rule 402(f) issues. This defies common sense and precedent. The examination of whether statements are plea-related is fact specific. A finding as to one statement does not necessarily reflect upon the admissibility of other statements. See *People v. Friedman*, 79 Ill. 2d 341, 352 (1980). Therefore, the appellate court's holding that the August 15 statements were made in the course of plea negotiations did not require the trial court to reconsider the admissibility of all other statements on remand. As we noted in *Enis*, the trial court retains inherent authority to reconsider rulings as long as the cause is pending before it.

However, the "trial court's *power* to modify its rulings does not imply that the court is *obligated* to hold" a hearing. (Emphases in original.) *Enis*, 163 Ill. 2d at 387.

Defendant argues that if this court should find that collateral estoppel bars relitigation of the unappealed issue, reversal is warranted because he was denied effective assistance of counsel by his original appellate counsel. Defendant maintains that his original appellate counsel was ineffective for failing to challenge the July 27, 1994, and August 16, 1994, statements. The appellate court declined to consider the argument because it held that the July 27 and August 16 statements were independent admissions and not excluded under Rule 402(f). 315 Ill. App. 3d at 508.

In *People v. Albanese*, 104 Ill. 2d 504 (1984), we adopted the two-prong, performance-prejudice test first enunciated in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), to examine claims of ineffective assistance of counsel. The *Strickland* test applies to claims of ineffective appellate counsel. *People v. Johnson*, 205 Ill. 2d 381, 405 (2002). In order to prevail on his claim, defendant must show that counsel's failure to raise the issue on appeal was objectively unreasonable and that this decision prejudiced him. *Johnson*, 205 Ill. 2d at 405-06. Appellate counsel is not required to brief every conceivable issue on appeal and may refrain from developing nonmeritorious issues without violating *Strickland* (*People v. Simms*, 192 Ill. 2d 348, 362 (2000)), because defendant suffers no prejudice unless the underlying issue is meritorious (*People v. Easley*, 192 Ill. 2d 307, 329 (2000)). Because we find the issue dispositive, we examine the underlying merits of defendant's claim to assess whether he was prejudiced by appellate counsel's failure to raise the issue on appeal.

Supreme Court Rule 402(f) encourages the negotiated disposition of criminal cases because the rule eliminates the risk that the jury will hear statements or admissions made by defendants during plea negotiations. *Friedman*, 79 Ill. 2d at 351. Rule 402(f) states:

> "If a plea discussion does not result in a plea of guilty, or if a plea of guilty is not accepted or is withdrawn, or if judgment on a plea of guilty is reversed on direct or collateral review, neither the plea discussion nor any resulting agreement, plea, or judgment shall be admissible against the

defendant in any criminal proceeding." 177 Ill. 2d R. 402(f).

We have adopted a two-prong test to examine whether a statement is an inadmissible plea-related statement. *Friedman*, 79 Ill. 2d at 351. To prevail, a defendant must satisfy both prongs. A statement is plea-related and, therefore, inadmissible under Rule 402(f) if defendant exhibited a subjective expectation to negotiate a plea and the expectation was reasonable under the totality of the objective circumstances. *Friedman*, 79 Ill. 2d at 351.

We adopted this test in *Friedman*, wherein we held that the federal analysis applicable to determine when a statement is plea-related equally applied to our examination under Rule 402(f) because of the "substantial similarity" between the rules.[2] *Friedman*, 79 Ill. 2d at 351, citing *United States v. Robertson*, 582 F.2d 1356, 1365 (5th Cir. 1978) (establishing the "general framework for determining whether a conversation is an inadmissible plea negotiation" under the then-existing federal rules).

In *Friedman*, the defendant was convicted of theft by deception for his involvement in a series of fraudulent investment schemes. The defendant was also charged with federal mail fraud for the same conduct. On appeal, the defendant challenged the introduction of a statement he made to an investigator for the office of the Attorney General. Particularly, the defendant's statement "If I'm convicted, I would rather go to a Federal prison as opposed to a State prison" was admitted against him. The record revealed that the defendant made this statement during a telephone conversation with the investigator, after the investigator answered the telephone with the greeting "Office of the Attorney General." The State responded that because the investigator clearly informed the defendant that he had no authority to negotiate, by telling the defendant that he "[had] no

---

[2]Federal Rule of Criminal Procedure 11(e)(6), once substantially similar in language to Rule 402(f), has now been formally amended and is more limited in its application. See *People v. Hart*, 214 Ill. 2d 490, 502-03 (2005).

control over that," the defendant's offer to bargain was not made as part of a plea negotiation. *Friedman*, 79 Ill. 2d at 350. We disagreed and held that "actual authority" to negotiate is not required under Rule 402(f). *Friedman*, 79 Ill. 2d at 352. As an initial matter, we held that a statement of an offer to plea is clearly an indication of a "defendant's intent to pursue plea negotiations." *Friedman*, 79 Ill. 2d at 352. Put another way, the defendant's statement satisfied the first prong because when he voiced his desire to bargain he exhibited a subjective expectation to negotiate. The facts further revealed that there was no other possible purpose for his statement. Consequently, we held that under the circumstances the "reasonableness of defendant's expectations" were evident. *Friedman*, 79 Ill. 2d at 353. Accordingly, the defendant's statement was inadmissible under Rule 402(f). *Friedman*, 79 Ill. 2d at 352.

We recently addressed Rule 402(f) in *People v. Hart*, 214 Ill. 2d 490 (2005). In *Hart*, we considered whether a defendant's inquiry to a detective regarding what the detective "could do for him" if he cooperated was inadmissible under Rule 402(f). *Hart*, 214 Ill. 2d at 511. We held that "this court never intended Rule 402(f) to exclude as evidence mere offers to cooperate *** where the offers were not accompanied by 'the rudiments of the negotiation process.' " *Hart*, 214 Ill. 2d at 504, quoting *Friedman*, 79 Ill. 2d at 353. There, we held that because the defendant did not request that the detective initiate contact or convey terms to the prosecutor or, alternatively, specify the terms he would require in exchange for pleading guilty, the rudiments of the negotiation process were not present, thereby rendering the defendant's statements admissible. *Hart*, 214 Ill. 2d at 511-12.

Defendant here contends that the record is clear that on July 27, 1994, and August 16, 1994, he conveyed offers to bargain, including the terms he would require in exchange for pleading guilty. We note that the record, including detectives' reports, a transcribed copy of defendant's statement, and a multitude of testimonial evidence spanning several years during both pretrial motions and trial, contains veiled references of an offer and is simply not clear when, and if, defendant ever conveyed an offer to bargain on the dates at issue–July 27, 1994, and August 16, 1994. Nevertheless, even if we accept as true defendant's assertion that he conveyed some offer to bargain on July 27, 1994, and August 16, 1994, defendant's claim must fail. Under the totality of the circumstances, it was objectively

unreasonable for defendant to believe he was engaged in plea negotiations on July 27, 1994, and August 16, 1994.

As an initial matter, our holding in *Friedman* does not dictate the exclusion of defendant's statements. In *Friedman*, we considered the admissibility of a bare offer to plea, nothing more. We held that plea negotiations was the purpose of the defendant's statement and that no other possible purpose for the defendant's statement existed. Thus, under the circumstances the "reasonableness of defendant's expectations" was evident. *Friedman*, 79 Ill. 2d at 353. The instant matter does not concern the admissibility of a bare offer to plea. In fact, defendant's alleged offers to bargain were not admitted against him at trial. Rather, only his statements disavowing his involvement in Dr. Dickerman's murder were admitted against him. Thus, unlike *Friedman*, here we consider the admissibility of defendant's exculpatory statements in the face of the detectives' express warnings that they had no authority to negotiate. Under the totality of these objective circumstances, we consider whether defendant's expectations were reasonable.

The factual distinctions between the instant matter and those present in *Friedman* are of importance because we have held that the characterization of a statement as plea-related is fact specific, and courts may consider a variety of factors in making this determination. *Friedman*, 79 Ill. 2d at 351-52; see also *Robertson*, 582 F.2d at 1366, 1368 ("the trial court should carefully consider the totality of the circumstances. Thus, each case must turn on its own facts. *** [W]e eschew a simplistic *per se* approach in favor of requiring a holistic examination of the circumstances surrounding the discussion"). A *per se* approach–one in which any offer by a defendant to plea would immediately render all subsequent statements inadmissible plea negotiations–would confuse the instant analysis with that used to resolve constitutional challenges pursuant to *Miranda*. See *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966); *Smith v. Illinois*, 469 U.S. 91, 83 L. Ed. 2d 488, 105 S. Ct. 490 (1984) (discussing the "rigid prophylactic rule" that once an accused makes a clear request for counsel, all further questioning must cease until counsel has been made available or until the accused initiates further conversation and knowingly and intelligently waived the right he previously invoked). The analysis here is necessarily different from *Miranda*: one provides a highly specific bright-line rule, the other

does not. Thus, courts may consider the nature of the statement, to whom defendant made the statement, and what the parties to the conversation said. See generally *Friedman*, 79 Ill. 2d at 352. Importantly, not all offers to bargain are inadmissible plea-related statements. In *Hart*, we reaffirmed this principle, stating that "offers to cooperate, without more, do not constitute plea negotiations or offers to enter into plea negotiations." *Hart*, 214 Ill. 2d at 507 (discussing *United States v. Pantohan*, 602 F. 2d 855 (9th Cir. 1979), *United States v. Levy*, 578 F. 2d 896 (2d Cir. 1978), and *United States v. Robertson*, 582 F. 2d 1356 (5th Cir. 1978)). Thus, courts must be careful to distinguish between a statement made in the furtherance of a plea discussion, which is inadmissible, and an independent admission, which may be admitted as evidence. *Friedman*, 79 Ill. 2d at 353, citing *United States v. Shotwell Manufacturing Co.*, 287 F.2d 667, 673 (7th Cir. 1961).

Our appellate court in the instant matter also aptly noted this distinction:

> "Every guilty person who voluntarily speaks to a detective probably hopes to benefit from the conversation, either by convincing the detective that he did not commit the crime or by obtaining leniency for his cooperation. We should resist an approach that characterizes every conversation between a defendant and a detective as a plea negotiation. The police have an investigatory function that the courts and even the State's Attorney do not have." 315 Ill. App. 3d at 506.

This investigatory function is critical to law enforcement, and we must be careful to recognize this distinction when interpreting whether Rule 402(f) applies. Particularly, while Rule 402(f) was enacted to encourage the negotiation process, it was not enacted to discourage legitimate interrogation techniques. Those arrested often seek leniency, and not all attendant statements made in the hope of gaining concessions are plea-related statements under Rule 402(f). See generally *Hart*, 214 Ill. 2d at 506-11 (examining numerous federal and appellate cases); see also *Robertson*, 582 F.2d at 1368 (distinguishing a plea of guilty and a mere admission or confession, noting that an admission may still be admissible "despite the fact that the accused makes some request of those in charge").

Here, on July 27, 1994, and August 16, 1994, we take as true

defendant's allegations that he offered to bargain. Again, however, we can discern no detail of this offer in the record, rather only vague references to offers to bargain. Pursuant to the second prong articulated in *Friedman*, we consider whether defendant's expectations were reasonable under the totality of the objective circumstances. Again, we consider the nature of the statements, to whom defendant made the statements, and most importantly here, what the parties to the conversations actually said.

The objective circumstances in the instant matter reveal that any expectation that he was engaged in plea negotiations on both July 27, 1994, and August 16, 1994, was not reasonable. Defendant did not give information to strike a deal with the detectives. Defendant did not confess. Defendant's statements were not prompted by a desire to seek leniency for his actions. It is plainly obvious that defendant gave information to exonerate himself–defendant spoke to the detectives each time to convince detectives that he did not commit a crime. The content of defendant's statements offer no indication that he divulged information with the intent to plead guilty, or even reduce his culpability. In each statement defendant denied any involvement in the circumstances causing Dr. Dickerman's death: on July 27, 1994, he claimed no knowledge of the circumstances surrounding Dr. Dickerman's death and, alternatively, on August 16, 1994, he claimed that Dr. Dickerman's death was the result of heart failure. We do not believe these exculpatory discussions exhibit the requisites of plea bargaining. The totality of circumstances here indicate that defendant was simply not plea bargaining. Thus, we hold that any expectation was not reasonable under the totality of the objective circumstances. See *Friedman*, 79 Ill. 2d at 351.

We note that this outcome is not inconsistent with the appellate court's decision concerning the August 15 statements. *People v. Jones*, 294 Ill. App. 3d 1125 (1998) (unpublished order under Supreme Court Rule 23). The objective circumstances surrounding the August 15 statements and the statements we consider today are not analogous. On August 15, defendant did not make an unsolicited offer to plead guilty in exchange for a lesser charge. Rather, the detectives visited defendant for the sole purpose of obtaining defendant's handwritten version of the events for the State's Attorney's review. The August 15 statement was a written statement prepared at the direction of the detectives for the sole purpose of

negotiations. After the detectives instructed defendant to prepare the statement, and defendant did so, the interview ended. On July 27 and August 16, however, the detectives refused defendant's attempts to bargain, and defendant continued to discuss Dr. Dickerman's death in order to convince the detectives he was not culpable.

Defendant finally requests that we consider the admissibility of the statements under the plain error exception to the waiver rule. However, " '[b]efore plain error can be considered ***, it must be plainly apparent from the record that an error affecting substantial rights was committed.' " *People v. Keene*, 169 Ill. 2d 1, 18 (1995), quoting *People v. Precup*, 73 Ill. 2d 7, 17 (1978). However, because we have determined that nothing in the record supports that defendant ever engaged in plea negotiations on July 27 or August 16, his statements were independent admissions, and our review under the plain error doctrine is not warranted.

### III. Involuntary Manslaughter Instruction

Defendant contends that he was entitled to a jury instruction on the offense of involuntary murder. The trial court refused to give the instruction, holding that there were no indications defendant acted in a reckless manner. The appellate court affirmed. 315 Ill. App. 3d at 508. Defendant states in his brief, "The jury could have found that [Dr. Dickerman] had died from a skull fracture suffered in a fall and further found that [defendant] had caused that fall, perhaps during a brief struggle which ensued when [Dr. Dickerman] confronted [defendant] about the forged checks." Accordingly, defendant argues that because the jury did not receive the instruction he is entitled to a new trial before a properly instructed jury.

The giving of jury instructions is a matter within the sound discretion of the trial court. *People v. Castillo*, 188 Ill. 2d 536, 540 (1999). An instruction on a lesser offense is justified when there is some credible evidence to support the giving of the instruction. *People v. DiVincenzo*, 183 Ill. 2d 239, 249 (1998). Where there is evidentiary support for an involuntary manslaughter instruction, the failure to give the instruction constitutes an abuse of discretion. *DiVincenzo*, 183 Ill. 2d at 249. Whether an involuntary manslaughter instruction is warranted depends on the facts and circumstances of each case. *DiVincenzo*, 183 Ill. 2d at 251.

The offenses of involuntary manslaughter and first degree murder require different mental states, such that involuntary manslaughter requires a less culpable mental state than first degree murder. Particularly, involuntary manslaughter requires that a defendant unintentionally kill an individual by recklessly performing acts that are likely to cause death or great bodily harm. 720 ILCS 5/9–3(a) (West 2000). Recklessness is defined in section 4–6 of the Criminal Code:

> "A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." 720 ILCS 5/4–6 (West 2000).

Though defendant contends that some evidence supports that he acted recklessly in causing Dr. Dickerman's death, the record in no way supports this assertion. At trial, defendant testified that he was not present at the time of Dr. Dickerman's death and that he last saw Dr. Dickerman alive. Alternatively, in his various statements to the detectives, defendant claimed that (1) he discovered Dr. Dickerman dead, (2) while he was at the house Dr. Dickerman had a heart attack and fell to the floor, and (3) while he was at the house Dr. Dickerman had a heart attack and hit his head when he fell to the floor. This evidence does not support a struggle and inadvertent fall.

In addition, pathology evidence admitted during trial did not warrant an instruction. Pathologists at trial explained that Dr. Dickerman sustained a skull fracture that was either the result of a blow to the head by a blunt object or the result of a fall. Defendant asserts that this evidence was sufficient for a jury to find that defendant inadvertently knocked Dr. Dickerman down during a brief struggle, causing his death. Again, defendant's own statements rebut this claim. There was simply no evidence at trial to support defendant's claim that he inadvertently caused Dr. Dickerman to fall. In order to require an instruction of involuntary manslaughter, defendant must be able to point to some evidence in the record that he acted recklessly. Because there is a complete absence of any evidence to support an involuntary manslaughter instruction, we find that the

trial court's refusal to give the instruction was not an abuse of discretion.


## IV. Venue

Defendant argues that the State failed to prove that Dr. Dickerman was killed in Sangamon County and therefore failed to prove a necessary element of the offense–venue–and his conviction must be vacated.

At the time of Dr. Dickerman's death, section 1–6 of the Criminal Code set forth the general venue requirements for criminal actions. 720 ILCS 5/1–6 (West 1994). Pursuant to this section, venue was a material element of the offense and the State was required to prove the element beyond a reasonable doubt. *People v. Digirolamo*, 179 Ill. 2d 24, 49 (1997). In the instant matter, the State was required to prove venue beyond a reasonable doubt.[3]

Therefore, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Evans*, 209 Ill. 2d 194, 209 (2004). It is not the province of this court to substitute its judgment

---

[3]Amended section 1–6 provides, "The State is not required to prove during trial that the alleged offense occurred in any particular county in this State." 720 ILCS 5/1–6(a) (West 2000). This amendment, however, does not apply in the instant matter. Amendments that affect procedure or remedies, and not substantive rights, apply retroactively to pending cases. *Digirolamo*, 179 Ill. 2d at 50. This court has held that amended section 1–6 does not apply retroactively because the amended version of section 1–6 effected a change in substantive law. *Digirolamo*, 179 Ill. 2d at 50.

for that of the jury, and we will not reverse a conviction unless the evidence is so unreasonable, improbable or unsatisfactory that it raises a reasonable doubt of defendant's guilt. *Evans*, 209 Ill. 2d at 209; *People v. Hall*, 194 Ill. 2d 305, 329-30 (2000); *Digirolamo*, 179 Ill. 2d at 43.

Venue is proper in any county where any element of the offense occurred. See *People v. Sims*, 244 Ill. App. 3d 966, 1004 (1993). Where the body of a homicide victim is discovered in Illinois, the death is presumed to have occurred in the state. 720 ILCS 5/1‒5(b) (West 1994). When the victim is not discovered in Illinois, the State does not receive the presumption and must establish venue beyond a reasonable doubt. Venue may be established by either direct or circumstantial evidence. Particularly, "[v]enue may be shown by circumstantial evidence and is proved if there is evidence from which it can be inferred that the crime was committed in the county where the prosecution took place." *Sims*, 244 Ill. App. 3d at 1004.

Dr. Dickerman's body was discovered beyond Illinois' boundaries. However, the record contains evidence from which a rational trier of fact could have concluded Dr. Dickerman's death occurred in Sangamon County. Importantly, the jury heard defendant's own statements of where the death occurred. In his July 27 and August 16 statements, defendant said Dr. Dickerman died in his home in Sangamon County. The jury learned that defendant informed the detectives that he removed Dr. Dickerman's body from his house in Sangamon County and drove the body outside Illinois, thereby explaining why the body was discovered beyond Illinois' boundaries. This evidence alone, viewed in the light most favorable to the prosecution, is sufficient to survive the instant challenge.

However, we also note that the jury learned defendant forged Dr. Dickerman's checks, that on the day he died Dr. Dickerman confronted defendant about the forgeries, and that on the day Dr. Dickerman died defendant attempted to hide evidence of the forgeries and appeared anxious and nervous when he was unable to retrieve the mail containing evidence of his forgeries. Further, the jury was presented with medical testimony at trial that Dr. Dickerman's death was more consistent with a blow to the head with a blunt object than a fall from a cliff. Finally, the jury also heard testimony from forensic investigators regarding evidence of bloodspatters on the bathroom

wall, window sill, and rug within Dr. Dickerman's house. The investigator testified that the blood gathered from the bathroom rug matched the victim's DNA. We find that this evidence, taken together, is sufficient to support venue beyond a reasonable doubt.

## V. Amendment of the Charges

Defendant argues that the State improperly amended the indictment on the day of trial. The State amended count III of the indictment, which charged that defendant's conduct created "a strong probability of death," to state that defendant's conduct "created a strong probability of death or great bodily harm."

The State may amend the charging instrument to correct formal defects at any time. 725 ILCS 5/111–5 (West 2000) (providing a nonexclusive list of formal defects). Defendant was charged with first degree murder, and the indictment prior to the amendment properly identified the relevant statute. 720 ILCS 5/9–1 (West 1996). The amendment did not alter or change the charge, or broaden the scope of the indictment. See *People v. Griggs*, 152 Ill. 2d 1, 32 (1992). Further, it did not add an alternative mental state. In effect, the indictment was amended to cure a scrivener's error. Defendant was neither taken by surprise nor unable to prepare his defense to the allegation. The trial court did not err in permitting the amendment.

## VI. *Apprendi v. New Jersey*

As a final matter, defendant argues that his conviction should be overturned pursuant to *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), because a fact that increased his imprisonment, the age of the victim, was not alleged in the charging instrument and not submitted to the jury and proven beyond a reasonable doubt.

An *Apprendi* violation is not *per se* reversible error and may be subject to a harmless-error analysis. *People v. Thurow*, 203 Ill. 2d 352, 363 (2003). Here, the State presented uncontested and overwhelming evidence during trial that Dr. Dickerman was 85 years old at the time of his death. We conclude, therefore, that any *Apprendi* violation in this case constituted harmless error.

Defendant cites *Blakely v. Washington*, 542 U.S. 296, 159 L. Ed.

2d 403, 124 S. Ct. 2531 (2004), as additional authority for the proposition that "an *Apprendi* error cannot be harmless." *Blakely*, however, simply holds that the statutory maximum for *Apprendi* purposes is the maximum sentence a trial judge may impose based solely on the facts behind the jury's guilty verdict or the defendant's guilty plea. See *Blakely*, 542 U.S. at 303, 159 L. Ed. 2d. at 413, 124 S. Ct. at 2537. *Blakely* does not dictate that an *Apprendi* violation cannot be a harmless error.

## CONCLUSION

For the reasons stated, the judgment of the appellate court is affirmed.

*Affirmed.*

JUSTICES GARMAN and KARMEIER took no part in the consideration or decision of this case.

JUSTICE McMORROW, specially concurring:

In the case at bar, defendant has raised a number of issues for our review. For the most part, this court is in agreement on the resolution of these claims. However, there is one issue upon which the court does not agree–whether defendant's appellate counsel following his first trial was ineffective for failing to challenge the admissibility of oral statements defendant made to police, on July 27, 1994, and August 16, 1994, as plea-related pursuant to Illinois Supreme Court Rule 402(f). The lead opinion finds that the July 27, 1994, and August 16, 1994, statements were *not* plea related and, thus, these statements were not inadmissible under Rule 402(f). As a result, the lead opinion finds that defendant's initial appellate counsel was not ineffective for failing to challenge the trial court's suppression ruling with regard to these statements. The dissent, however, finds that defendant *did* receive ineffective assistance of appellate counsel because the July 27, 1994, and August 16, 1994, statements *were* plea related and, thus, defendant was prejudiced by his initial appellate counsel's failure to challenge their admissibility under Rule 402(f).

I agree with the lead opinion that the oral statements made on the

two dates in question here were not plea related. However, I disagree with the lead opinion's analysis of this matter. First, the lead opinion characterizes defendant's statements on July 27, 1994, and August 16, 1994, as "exculpatory" (see pages 34 and 39) which is, in my view, inaccurate. On July 27, 1994, defendant told police that he found Dr. Dickerman, collapsed on the floor of his home, and attempted to give him CPR. Defendant admitted that he called no one to assist because he was afraid of getting in trouble. Defendant said that, instead of notifying anyone about Dr. Dickerman's condition, he returned the next day and disposed of Dr. Dickerman's body, making it look like Dr. Dickerman left on his own. On August 16,1994, defendant revised his July 27 statement, this time claiming that Dr. Dickerman suffered a heart attack while yelling at defendant about the forged checks. Defendant still said he did nothing to save Dr. Dickerman and never called for assistance. He also admitted, as before, to disposing of Dr. Dickerman's body. In my view, these statements should not be viewed as "exculpatory."

I also disagree with the analysis employed by the lead opinion to support its statement that "objective circumstances in the instant matter reveal that any expectation that he [defendant] was engaged in plea negotiations on both July 27, 1994, and August 16, 1994, was not reasonable." See slip op. at 20. The lead opinion reasons:

> "Defendant did not give information to strike a deal with the detectives. Defendant did not confess. Defendant's statements were not prompted by a desire to seek leniency for his actions. It is plainly obvious that defendant gave information to exonerate himself–defendant spoke to the detectives each time to convince detectives that he did not commit a crime. The content of defendant's statements offer no indication that he divulged information with the intent to plead guilty, or even reduce his culpability." Slip op. at 20.

I disagree with each of the above statements. As I will explain, defendant *did* give information to the detectives in the hopes of convincing the detectives that his actions amounted to something less than murder, *i.e.*, involuntary manslaughter or concealment of a homicide. Defendant *did confess*, albeit not to murder–defendant's statements were inculpatory as to other criminal offenses. Defendant *did* desire leniency in the respect that he was hopeful of convincing

the detectives that he was not responsible for and, therefore, should not be charged with, Dr. Dickerman's murder. Defendant hoped to be charged with some other lesser offense. Defendant *did not* hope to convince the detectives that "he did not commit a crime." See slip op. at 20. Defendant gave information to exonerate himself *of murder,* but he admitted to other crimes. Thus, the lead opinion offers no justification for its holding that defendant's expectation that he was negotiating a plea bargain was not reasonable and its analysis fails.

However, I am not persuaded by the dissent on this matter. The dissent, though lengthy, comes to one basic conclusion–that testimony presented at the June 1996 hearing on defendant's motion to suppress "establishes that, at least by the time of the July 27 interview, defendant was attempting to negotiate a plea with the State's Attorney's office and that the police agreed to act as his conduit for information." See slip op. at 48 (Kilbride, J., dissenting).

The dissent misses the point. It is true that defendant made offers to plead guilty to certain lesser offenses on August 3, 1994, and August 15, 1994. It may also be true that, at some point during defendant's meeting with police that took place on July 27, 1994, defendant made an offer to plead guilty. But defendant is not seeking to suppress these offers, which contain the "rudiments of the negotiation process" and which everyone recognizes as offers to negotiate a plea. This is because defendant does not allege that anyone ever testified at trial that he made an offer to plead guilty on July 27, 1994, or August 16, 1994. Instead, defendant is seeking to suppress, in their entirety, factual statements made to police during interviews conducted on these dates. In my view, the fact that defendant made offers to plead guilty does not, by itself, "establish" that the statements defendant seeks to suppress were plea-related discussions under Rule 402(f). See slip op. at 48 (Kilbride, J., dissenting).

Contrary to the dissent, I believe that, in order to determine whether it was objectively reasonable for defendant to believe that he was engaged in plea negotiations at the time he made the statements he seeks to suppress, it is important to consider when the offers were made, *i.e.*, whether the offer to plead guilty was made prior to or subsequent to the statement at issue, and what else was said by the parties present. I reject the notion, espoused by the dissent, that there

is an "inherent interrelationship" (see slip op. at 49 (Kilbride, J., dissenting)). between defendant's attempts to negotiate a plea, such that, subsequent to an offer to plead guilty, every conversation a defendant has with police, over the course of weeks or months, is automatically transformed into "plea negotiations."

I also do not agree with the dissent that *Friedman*'s holding that " 'a preamble explicitly demarcating the beginning of plea negotiations' " is not required, is at odds with the need for some sort of prefatory offer. (Emphasis omitted.) See slip op. at 51 (Kilbride, J., dissenting), quoting *Friedman*, 79 Ill. 2d at 352. Nor do I agree with how the dissent interprets *Friedman* when it states that "only '[w]here a defendant's subjective expectations are not explicit, [do] the objective circumstances surrounding defendant's statement take precedence in evaluating defendant's subsequent claim that the statement was plea-related.' " (Emphasis omitted.) Slip op. at 52 (Kilbride, J., dissenting), quoting *Friedman*, 79 Ill. 2d at 353. As I will explain, the dissent's understanding of *Friedman* is fundamentally flawed.

Finally, I find no justification for the dissent's characterization of the police officers' dealings with defendant as disingenuous. See slip op. at 62 (Kilbride, J., dissenting). In my view, these remarks are not supported by the record.

For all of the above reasons, I write separately.


BACKGROUND

At the heart of defendant's sixth amendment claim is an issue of importance: When is a statement part of plea negotiations and, therefore, subject to suppression under Rule 402(f)? An answer to this question was recently provided by this court in *People v. Hart*, 214 Ill. 2d 490 (2005). In *Hart*, we reaffirmed the two-part test recognized in *Friedman* for determining whether a particular statement is plea-related. We said that courts must consider, first, whether the accused exhibited a subjective expectation to negotiate a plea, and, second, whether that expectation was reasonable under the totality of the objective circumstances. *Hart*, 214 Ill. 2d at 503, citing *Friedman*, 79 Ill. 2d at 351. We also noted that, " '[b]efore a discussion can be characterized as plea related, it must contain the rudiments of the negotiation process, *i.e.*, a willingness by defendant

to enter a plea of guilty in return for concessions by the State.' " *Hart*, 214 Ill. 2d at 503, quoting *People v. Friedman*, 79 Ill. 2d 341, 353 (1980). According to *Hart*, then, a discussion is not plea-related unless the defendant's subjective expectation to enter into plea negotiations is *communicated* by some type of offer to plead guilty in exchange for concessions *and* the defendant's subjective belief that he is plea bargaining is objectively reasonable under the attendant circumstances.

It is important to keep in mind that, in both *Friedman* and *Hart*, the question before the court was whether it was error to have permitted testimony at trial revealing that the defendants had made certain "inquiries," *i.e.*, that the defendant in *Friedman* inquired into "making a deal" and that the defendant in *Hart* inquired into "what I could do for him if he cooperated." The issue was whether these inquiries were evidence of the defendants' subjective belief that they were attempting to enter into a "plea discussion." Thus, both *Friedman* and *Hart* dealt with the first prong of the two-part test. That is not the issue in the case at bar. Here, there is no question that, on certain dates, defendant made offers in an attempt to enter into plea negotiations. But the statements defendant made when attempting to enter into plea negotiations were not admitted at trial, at least with regard to the July 27, 1994, and August 16, 1994, dates. The question in the case at bar is whether it was objectively reasonable under the attendant circumstances for defendant to believe that he was actually engaged in plea negotiations when he made the factual admissions and other statements which he now seeks to suppress.

Consequently, resolution of the issue before this court is highly dependent upon the facts of the case. Thus, an accurate and detailed statement of facts is of utmost importance. In the case at bar, any decision about when defendant made the offer containing "the rudiments of the negotiation process" and whether it was reasonable under the circumstances for defendant to have believed that he was engaged in plea bargaining when he made the statements he seeks to suppress must be determined after a thorough examination of the facts. To that end, I offer the following additional facts, which I believe are important to the resolution of the matter before us.

Defendant, an itinerant painter, was hired in July 1992 by Dr.

Henry Dickerman, an 84-year-old retired gentleman, to do some painting and repair work on Dickerman's home. Defendant was working at the Dickerman residence in August 1992 when Dr. Dickerman disappeared. On Tuesday, August 11, 1992, Dr. Dickerman had lunch with a group of friends, but failed to attend his regular Wednesday bridge game on August 12, 1992. His friends reported him missing on August 12, 1992, and the authorities began a massive investigation in an attempt to locate Dr. Dickerman. As part of this investigation, the police wanted to speak with defendant. On August 14, 1992, the police left a message for defendant on his mother-in-law's phone. The next day, August 15, 1992, defendant left the State of Illinois. He gave his wife a note[4] to give to the police in which he claimed to have no knowledge regarding the disappearance of Dr. Dickerman.

On September 1, 1992, Dr. Dickerman's home was processed as a crime scene. At this time, high-velocity bloodspatter, consistent with cast-off from a blunt-force injury, was discovered in the upstairs master bathroom. On September 5, 1992, skeletal remains were discovered in a Wildlife Preserve in Missouri, near St. Louis. On September 27, 1992, these remains were positively identified as the remains of Dr. Dickerman. Two days later, on September 29, 1992, Dr. Dickerman's car was located in a St. Louis airport parking lot.

Defendant returned to Illinois and was arrested in Springfield on October 6, 1992, in relation to other alleged crimes. On this date, defendant, in the presence of his counsel, was questioned extensively by local police and an agent of the FBI regarding Dr. Dickerman's disappearance. Defendant admitted that he had been at the Dickerman home on August 11, 1992, to do some painting. Defendant said he saw Dr. Dickerman leave the home in the morning and return sometime after 1 p.m. Defendant said that Dr. Dickerman left the home again around 4 p.m., stating that he was going out to dinner with friends. Defendant said that he finished painting, left Dr. Dickerman's home around 4:30 p.m., and never saw Dr. Dickerman again. Defendant also told the police that, on August 12, 1992, he left Springfield at about 7 a.m. to go to Peoria to gamble on a riverboat

---

[4]The contents of this note is reported, in full, in the lead opinion. See slip op. at 5.

casino. According to defendant, he missed the 9 a.m. cruise so he went to a bar called Katy Hooper's to wait for the next cruise at 11:30 a.m. He described the waitress who served him. Defendant also told the police that he had a VIP pass at the casino and was "rated" for his gambling. Defendant repeated this story when police reinterviewed him on October 13, 1992, in the presence of counsel.

The information defendant gave police was checked and determined to be a fabrication. The waitress at Katy Hooper's whom defendant described had not been working that day. Moreover, no one else at the bar remembered seeing defendant on August 12, 1992. In addition, the casino checked defendant's rating cards and could not verify that defendant had been gambling on August 12, 1992.

In the course of the police investigation, it was discovered that three out-of-sequence checks, made out to defendant and totaling more than $5,000, had been drawn on Dr. Dickerman's account. Defendant was charged with three counts of forgery in relation to these checks. On February 17, 1993, defendant pled guilty to one of the counts of forgery and, on March 23, 1993, was sentenced to five years' imprisonment.

On July 12, 1993, two Springfield police officers, Cox and Young, went to the Graham Correctional Facility, where defendant was serving his sentence for the forgery conviction. The officers advised defendant that information he had given the police regarding his whereabouts on August 11 and 12, 1992, did not check out. They asked if he would be willing to speak with them. Defendant was also advised that he would soon be charged with certain weapons charges. Defendant indicated at this time that he wished to make another statement regarding Dr. Dickerman's disappearance because 80% of what he had previously told police was true, but there were some changes he wanted to make. Defendant stated, however, that he wished to have counsel present. He noted that he was unsure whether he was still being represented by the attorney who had assisted him in the forgery matter. He asked the officers to check into the matter of his representation because he had been unsuccessful in reaching his previously assigned counsel. Nothing substantive regarding the Dickerman matter was discussed on this date. Although defendant's counsel was contacted, no date was set for another interview.

On September 23, 1993, Springfield police officers Cox and

Young accompanied FBI agent Schmidt to Graham Correctional Facility. A warrant was served on defendant concerning certain weapons charges. Although defendant was interviewed on this date, the Dickerman case was not discussed.

In June 1994, Springfield police detectives traveled to Indiana to meet with defendant's mother and other relatives. The detectives explained that it was likely that defendant would soon be charged with first degree murder in connection with Dr. Dickerman's death. The officers asked the family if they had any further information concerning defendant's involvement in Dr. Dickerman's death. It was also suggested that, if defendant was not responsible for Dr. Dickerman's death, it would be in his best interests for him to contact his attorney so that he could make arrangements to meet with the police and explain the extent of his involvement.

Shortly thereafter, in July 1994, the Springfield police were contacted by defendant's mother. She said defendant wanted to talk with the police, but wanted the conversation to be taped. She said that defendant asked that the detectives bring two tape recorders so that one copy of the taped interview could be retained by defendant. Defendant's mother also indicated that defendant wanted some type of "note" from the State's Attorney stating the penalty ranges for various crimes from manslaughter on up to murder.

On July 27, 1994, Springfield police officers Young and Williamson went to Big Muddy Correctional Facility, where defendant was then being housed. They testified at the suppression hearing that they brought two tape recorders, but could not remember if they also brought any "note." The officers testified that, upon arriving at the facility, defendant was advised of his rights and that he agreed to waive his rights. The tape recorders were started and the interview began. Once the taped interview began, defendant was again given *Miranda* warnings. Notably, defendant was told that anything he said could and would be used against him in a court of law. Defendant stated he understood. Nowhere in the taped interview does defendant indicate that he is giving his statement for a particular purpose other than to amend his earlier statements. In addition, the officers who were present testified that no one promised defendant anything in exchange for defendant's taped statement.

The taped interview began around noon. Five minutes later, the

tape was stopped at defendant's request. Defendant spoke with the detectives for about 55 minutes with the tape recorder off. Both officers testified that during this time defendant essentially gave them a "preview" of what he later said on the tape. The officers also testified that, during this time, defendant began questioning *them*, attempting to learn what the police already knew from their investigation. At one point, defendant appeared frustrated because the detectives were not forthcoming with information about the investigation. He then blurted out, "I know you don't have the murder weapon." Defendant also asked the detectives about blood in the upstairs bathroom–a fact that had not been publicly released.

At about 1 p.m., the tape recorders were turned on and the interview resumed. According to the transcript of the interview, defendant told the detectives that Dr. Dickerman discovered that defendant had forged some of Dr. Dickerman's checks on Monday, August 10, 1992. Defendant said that Dr. Dickerman spoke to him about the checks and, although Dr. Dickerman was not happy about what he had done, they were able to come to an agreement. Defendant said that they had agreed that defendant would do some additional work around the Dickerman residence to work off the debt. Defendant said that the next day, August 11, 1992, he did some painting at Dr. Dickerman's until around 4:30 p.m., when he went to pick up his wife. They shopped for a birthday gift for his mother-in-law and then he dropped his wife off at home. Defendant said he then went back to Dr. Dickerman's home between 4:30 and 5 p.m., to pick up a check for some materials. He said that, when he arrived, the door was open and he walked inside. Defendant said he found Dr. Dickerman lying on the floor, dead, next to his green chair in the livingroom. Defendant then said, "I don't–in my opinion I don't think that he was murdered." Defendant said he thought Dr. Dickerman had a heart attack and, for that reason, he tried to give Dr. Dickerman CPR.

Defendant went on to explain, "I did not kill Dr. Dickerman," but because only Dr. Dickerman knew about the arrangement they had reached with regard to the forged checks, he became worried that he would get into trouble. For this reason, defendant said, he did not call for help. Instead, defendant said he left the Dickerman home, leaving the door unlocked, hoping that someone else would find the body. Defendant claimed that, later that evening, he returned to the

Dickerman residence and, as a gesture of compassion, moved Dr. Dickerman's body to the couch.

Defendant said that, after a sleepless night, he came up with a plan to get rid of Dr. Dickerman's body. Between 6:30 and 7 a.m., he went back to Dr. Dickerman's home, placed the body in the trunk of Dr. Dickerman's car, and drove around until he found a place to dump the body. After throwing the body over a cliff, defendant drove to Lambert-St. Louis International Airport, left the car in long-term parking, took the shuttle to the terminal, and took a taxi to a truck stop, where he disposed of a number of Dr. Dickerman's personal items (checkbook, bank statement, keys, glasses, and medicine) that defendant had taken to make it look as if Dr. Dickerman had gone away on his own.

The transcript of the taped interview contains no offer to plead guilty. In fact, Officer Young, when questioned at the suppression hearing, did not recall that defendant made any offers on this date. It was not until he was confronted with the fact that there was a brief notation at the end of his notes regarding the visit that he remembered any offer. When asked about the entry, Officer Young had only a vague memory that, at some point during the officers' visit on this date, defendant indicated that he believed the most he could be charged with, based on his actions, was involuntary manslaughter or concealment of a body; that defendant indicated a willingness to plead to a lesser charge. Officer Young admitted that he agreed to convey the offer to the State's Attorney. It should be noted, however, that Officer Young also testified, "I remember telling him [defendant] we couldn't negotiate anything with him." Moreover, as noted earlier, no one ever testified at trial that defendant made an offer to plead guilty on July 27, 1994.

Defendant pled guilty to gun charges on July 28, 1994, and, for this reason, was moved to the Franklin County jail. On August 3, 1994, Springfield police officers Cox and Young went to the Franklin County jail to review with defendant the transcript of the earlier taped interview. Defendant listened to the tape as he read along with the transcript. Defendant agreed that the transcript was accurate and signed it. At the April 1996 suppression hearing, Officer Young testified that, *after the transcript was reviewed,* defendant indicated that he was willing to negotiate a plea to a lesser offense for a

reduced sentence. The officers said they told defendant that they had no ability to negotiate any deals or accept any offers, but agreed to transmit the offer to their supervisor. Officer Young testified that when he returned to the police station he informed his supervisor, Sergeant Conway, of defendant's offer. At Sergeant Conway's request, Officer Young went back to see defendant on August 15, 1994, and had defendant write out his plea offer. This is the written statement which the appellate court ruled inadmissible under Rule 402(f) after defendant's first trial and, thus, was suppressed at defendant's second trial.

On August 16, 1994, Springfield police officers returned to the Franklin County jail, this time to serve a warrant on defendant for the murder of Dr. Dickerman. The officers said they brought a copy of the Criminal Code so that defendant could read the elements of the offense of murder. The officers suggested that, if defendant believed the charge of murder was inappropriate, he should tell them why. Defendant, in an effort to convince the police that he did not murder Dr. Dickerman, agreed to speak with the officers. Defendant was again given *Miranda* warnings. He then told police a different version of what happened on August 11, 1992. Defendant said that Dr. Dickerman received the bank statement and discovered the forged checks on Tuesday, August 11, 1992 (not Monday, August 10, 1992, as he had previously indicated). Defendant said that Dr. Dickerman became quite angry and began yelling at him. At this point, defendant said, Dr. Dickerman clutched his chest and fell down, hitting his head on the fireplace as he went. The remainder of defendant's story, regarding the disposal of the body, remained the same as in his earlier statement.

## ANALYSIS

Only the statements defendant made to police on July 27, 1994, and August 16, 1994, are at issue in the present appeal. Defendant contends that everything he told police on these two dates constitute plea discussions and, therefore, should have been ruled inadmissible under Rule 402(f). Because defendant's initial appellate counsel did not challenge the admissibility of these statements in his first appeal, defendant claims he received ineffective assistance of counsel.

Illinois Supreme Court Rule 402(f) provides:

˘36˘

"If a plea discussion does not result in a plea of guilty, or if a plea of guilty is not accepted or is withdrawn, or if judgment on a plea of guilty is reversed on direct or collateral review, neither the plea discussion nor any resulting agreement, plea, or judgment shall be admissible against the defendant in any criminal proceeding." 177 Ill. 2d R. 402(f).

Since the rule provides that "plea discussions" are inadmissible, the rule begs the question, what is a plea discussion? As explained above, we addressed this issue recently in *People v. Hart*, 214 Ill. 2d 490 (2005). In *Hart*, Decatur police detective Michael Beck testified at defendant's trial that he had interviewed defendant after his arrest, advised the defendant of his rights, and the defendant agreed to speak with him. Beck testified that defendant initially began talking about an outstanding warrant, but Beck told the defendant that he wanted to talk about the armed robbery. Beck testified that he told defendant that he knew defendant was involved (defendant had been tentatively identified by witnesses) and that defendant then asked "what I could do for him if he cooperated." Beck testified that he told defendant he could not make any promises, but would tell the State's Attorney of his cooperation. The interview ended and defendant never admitted any involvement in the robbery. Based on Beck's testimony, the prosecutor argued, in closing argument, "Ladies and gentlemen, only guilty men want to know what they get if they cooperate." On appeal, defendant argued, for the first time, that he was denied a fair trial when the prosecutor elicited testimony that defendant attempted to plea bargain and commented on the attempt in closing argument. In resolving this appeal, we held that defendant's offer to cooperate was not a "plea discussion" within the meaning of Rule 402(f). After an extensive examination of other cases, we concluded that defendant's inquiry into what could be done if he *cooperated* did not contain the "rudiments of the negotiation process" and, thus, was not a plea discussion. Also, we held that defendant's decision to make no statement after hearing the detective's response to his inquiry was an indication that defendant did not have a "subjective expectation" that he was negotiating a plea and that, even if defendant's inquiry was evidence of defendant's subjective expectation, that expectation was not reasonable under the totality of the objective circumstances. *Hart*, 214 Ill. 2d at 511-12.

The case at bar is quite different. Here, there is evidence that

defendant *did* make an offer which contained the "rudiments of the negotiation process." The record suggests that, at some point on July 27, 1994, defendant made an offer to plead guilty to some offense (involuntary manslaughter or concealment) in exchange for a particular sentence. However, there is also evidence that defendant's offer to plead guilty did not come until August 3, 1994, after the transcript of his July 27, 1994, statement was reviewed. In either event, it is clear that any actual offers by defendant to plead guilty were "plea discussions" and, as such, these plea offers, like the August 15, 1994, written plea offer, would be inadmissible under Rule 402(f).

As noted earlier, however, defendant is not seeking to suppress his offers to plead guilty. Indeed, no one ever testified, at either of defendant's two trials, that defendant made an offer to plead guilty on July 27, 1994, or August 16, 1994. Thus, the "devastating effect" that revealing to a jury a defendant's offer to plead guilty can have on a case (see *Friedman*, 79 Ill. 2d at 353), which Rule 402(f) is intended to prevent, did not occur in this case.

Here, defendant is asking us to find that admissions he made on July 27, 1994, and August 16, 1994, regarding his involvement in the disappearance and death of Dr. Dickerman, should have been suppressed as plea-related discussions, *i.e.*, statements made in furtherance of his offers to plead guilty. To decide this issue, the facts surrounding the statements must be considered. For this reason, I analyze the two dates separately.

### July 27, 1994

On July 27, 1994, Springfield police officers went to see defendant in response to his request and conducted a taped interview. The transcript of the interview, as well as the officers' testimony, establishes that prior to any questioning, defendant was advised of his rights and was specifically told that anything he said could be used against him. Defendant acknowledged his understanding of these warnings on the tape and, later, when he signed the transcript. Nothing on the tape or transcript and no testimony at the motion to suppress or at trial supports the notion that, prior to giving his statements, defendant offered to plead guilty to any crime or that his statements were made in furtherance of such an offer. Instead, the

evidence strongly suggests that defendant made his statement in an attempt to cooperate with the police. Thus, as in *Hart*, the statements are not plea discussions.

As noted above, there was some evidence presented at the hearing on the motion to suppress which suggests that, at some point during defendant's meeting with police on this date, defendant tried to elicit from the officers an agreement that his actions constituted some offense other than murder and that he should be charged with some other offense. However, based on the record and, in particular, the testimony elicited from the officers at the hearing on the motion to suppress, even if defendant did offer to plead guilty on this date, the admissions defendant made during the taped interview were made prior to any such offer.

I reach this conclusion based on the totality of the circumstances. The officers testified that defendant was manipulative and conniving. We know, too, that he was a good storyteller who could build elaborate stories, complete with intricate and plausible embellishments, to suit the situation. This is evident from the letter he sent to police in August 1992, explaining his rationale for leaving the state, and the story he told in October 1992, regarding his whereabouts on August 11 and 12, 1992. It is also clear from the record that defendant requested the meeting with police after he learned that it was likely that he would soon be charged with murder. Defendant knew that the police had investigated his alibi for August 12, 1992, and found that the alibi did not check out. It is reasonable to conclude, therefore, that one of defendant's motives for requesting the meeting was to learn what the police knew about his involvement in Dr. Dickerman's disappearance and what the police knew about the cause of Dr. Dickerman death. Defendant wanted to discern what evidence the police had so that he could tailor his statements to conform with the evidence. This explains why, five minutes into the taped interview, as soon as defendant was asked to explain his whereabouts on August 12, 1992, defendant asked that the tape be stopped. It appears that defendant wanted to "test" some information on the officers. For example, defendant suggested that Dr. Dickerman had not been murdered so he could see the officers' reaction. This is supported by the officers' testimony that, when the tape was shut off, defendant began asking them questions about the investigation and that he became frustrated when they refused to tell him about the

autopsy results and other information. When defendant was unable to get the information he wanted, he tried to convince the officers that he was guilty of some crime other than murder. To that end, he recounted the story of how he found Dr. Dickerman already dead and disposed of Dr. Dickerman's body.

In my view, the contents of the taped interview, as well as defendant's behavior, indicate that any offer to plead guilty came after he had the opportunity to provide the officers with a factual basis for the lesser charges. The question, then, is whether defendant's subsequent plea proposal has the ability to convert his earlier statements into a "plea discussion." I would answer this question in the negative. In *People v. Friedman*, 79 Ill. 2d 341, 353 (1980), this court held "there is a distinction between a statement made in the furtherance of a plea discussion and an otherwise independent admission which is not excluded by our rule." Explaining, we held that "where a defendant's subjective expectations are not explicit, the objective circumstances surrounding defendant's statement take precedence in evaluating defendant's subsequent claim that the statement was plea related." *Friedman*, 79 Ill. 2d at 353. As an example, we cited with approval *United States v. Levy*, 578 F.2d 896 (2d Cir. 1978), wherein the court held:

> "Plea bargaining implies an offer to plead guilty upon condition. The offer by the defendant must, in some way, express the hope that a concession to reduce the punishment will come to pass. *A silent hope, if uncommunicated, gives the officer or prosecutor no chance to reject a confession he did not seek. A contrary rule would permit the accused to grant retrospectively to himself what is akin to a use immunity. Even statements voluntarily made after Miranda warnings would be later objected to on the purported ground that they were made in anticipation of a guilty plea since reconsidered.* A balanced system of criminal justice should not be made to function in such a swampy terrain." (Emphasis added.) *Levy*, 578 F.2d at 901.

In my view, the timing of defendant's plea proposal is important. Rule 402(f) may not be used to retrospectively immunize statements made before an offer to plead guilty has been proffered. A defendant's failure to communicate his subjective expectation denies

the officers the opportunity to reject the defendant's proffered statements. Thus, in the case at bar, even if defendant had a subjective expectation that his factual statements *were* being made in furtherance of some later proposal, that expectation was not reasonable. Accordingly, I would hold that the factual statements defendant made on July 27, 1994, were not subject to suppression because they were independent admissions and not made in furtherance of any subsequent plea offer.

Finally, even if it is true that defendant made an offer to plead guilty to a lesser offense at the outset of the July 27 meeting with police, I would find that, under the objective circumstances, any subjective belief that defendant had that he was engaged in plea negotiations was unreasonable. Here, before, defendant gave his taped interview, defendant was given *Miranda* warnings and was explicitly told that his statements would be used against him. Moreover, as the officers repeatedly testified, whenever defendant made any offers to plead guilty, they expressly disclaimed any ability to negotiate a plea. The transcripts of the suppression hearings clearly show that the officers repeatedly informed defendant that they had no control over what charges would be filed, that they told defendant that they were not in a position to negotiate with him, and that defendant said he understood that the most the officers could do was to let the State's Attorney know what offers defendant was willing to make. In fact, the officers characterized all of defendant's offers, regardless of when they were made, as "unilateral" attempts to negotiate.

These factors should take precedence over any subjective expectation that defendant might have had. Thus, even if defendant attempted to enter into plea negotiations at the outset of the meeting, that attempt was rejected by the officers and, for that reason, I would find that any subjective expectation that defendant may have had that his taped interview was part of a plea discussion was not reasonable under the circumstances. Rule 402(f) provides no basis for suppressing the statements defendant made on July 27, 1994.

### August 16, 1994

On August 15, 1994, defendant gave the police officers a written offer to plead guilty. The next day, however, on August 16, 1994,

Officers Cox and Williamson returned to the Franklin County jail with a warrant for defendant's arrest on the charge of murder. Thus, defendant's offer had been rejected.

Officer Cox testified that, when they visited defendant on this date, they brought with them a book containing the Criminal Code. He explained at the suppression hearing:

> "Officer Cox: Mr. Jones, in the other interview[,] was very interested in paperwork, and we wanted to make sure when we went down there to talk to him in reference to the warrant that we could show him that we weren't stretching anything, we wanted to be able to show him in black and white what the first degree murder–what the statute said was first degree murder and any other charges he may be curious about.
>
> Q. So you wanted to be able to show him what the statute actually said?
>
> A. Yes.
>
> Q. And this was when you were bringing a warrant for his arrest for that particular charge, first degree murder?
>
> A. Yes.
>
> Q. Okay. Why did you even care what he though at that point, since he in fact had been charged; is that correct?
>
> A. He had been charged with first degree murder but all through this investigation I believe as a team we've done everything we could to be straightforward with Mr. Jones, and he expressed on earlier occasions that he believed it was involuntary manslaughter and concealment of a homicide, and we wanted to let him read the words out of the law book himself to draw that conclusion."

Detective Williamson also explained what transpired on August 16, 1994:

> "Detective Williamson: Mr. Jones, as I'm sure you know[,] is very thorough, he had a lot of time to read up and did, he kept himself apprised of a lot of the law and we had on a couple of conversations talked about the different statutes under the Illinois law, and we did take that Chapter, I believe it was still Chapter 38 at that time, it may have

changed, but we did take that book to Franklin County jail anticipating that he would want to read that because he did have materials with him or available to him that he cited when we did interview him.

Q. [Prosecutor:] You mean like the differences between first degree, second degree, that type of thing?

A. Well, he did ask questions about that but the materials he had available were motions to file and more technical aspects like we're doing now, so I don't know if he had a Chapter 38 and he asked us questions related to that area."

At some point during defendant's discussion with the officers on August 16, 1994, defendant expressed a desire to amend his previous statement. The officers testified that, once again, they advised defendant of his *Miranda* rights. Defendant then told the officers that he had been present in Dr. Dickerman's home when Dr. Dickerman received his bank statement and discovered the forged checks. Defendant said that Dr. Dickerman became extremely angry with him, started yelling at him, and had a heart attack while yelling at him about the checks. Defendant said that Dr. Dickerman fell down and hit his head on the fireplace.

It is clear that defendant's factual statements on this date were independent admissions. It is important to note that there is no indication that defendant prefaced his statements on this date with a new offer to plead guilty. No one testified, either at the hearing on the motion to suppress or at trial, that defendant ever made an offer to plead guilty on August 16, 1994, or that his statements were part of a plea discussion. Thus, while defendant may have had a subjective expectation that his statements on this date were being made in furtherance of some earlier offer, that subjective expectation was not communicated, nor was it objectively reasonable. His earlier offer had been rejected, as evinced by the fact that a warrant had been issued charging him with murder. The officers who delivered the warrant brought a Criminal Code with them to show defendant that his actions constituted murder. Defendant's additional statements were made in an effort to convince the officers otherwise.

Defendant was well aware that the officers had no ability to authorize a change in the charges against him. The officers had testified on several occasions that they repeatedly told defendant that

they had no ability to plea bargain and that defendant acknowledged and understood this. Defendant was knowledgeable and experienced. He knew that the officers were investigating Dr. Dickerman's death and were seeking information from him. Defendant was given *Miranda* warnings before he gave his new statement. Defendant decided to cooperate, with the hope that he could convince the officers with a new, more plausible story that he did not murder Dr. Dickerman. Based on the objective circumstances, any subjective expectations defendant may have had that he was engaged in plea discussions were not reasonable. I conclude that the statement defendant made on this date was not a plea discussion and Rule 402(f) simply does not apply.

## CONCLUSION

For the reasons set forth above, I would find that defendant's July 27, and August 16, 1994, statements were independent admissions and not plea discussions. Therefore, they were not subject to suppression under Rule 402(f). As a result, I agree with the majority that defendant's initial appellate counsel was not ineffective for failing to challenge the trial court's ruling on the motion to suppress with regard to these statements.

JUSTICE FREEMAN joins in this special concurrence.

JUSTICE KILBRIDE, concurring in part and dissenting in part:

I agree with the lead opinion that the trial court did not err in denying defendant's motion for substitution of judge (slip op. at 11), that the "special-circumstances" exception does not preclude the application of collateral estoppel in this case (slip op. at 12-13), and that the State sufficiently proved venue at trial (slip op. at 23-24). I respectfully disagree, however, with the remainder of its analysis. I particularly disagree with the rejection of defendant's claim that his sixth amendment right to effective assistance of counsel was violated when his original appellate counsel failed to raise the issue of the denial of defendant's motion to suppress his July 27 and August 16 statements.

When examining a claim of ineffective assistance of counsel, we

apply the two-part test in *Strickland v. Washington*, 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984); *People v. Evans*, 186 Ill. 2d 83, 93 (1999). That test requires the defendant to show: (1) counsel's performance fell below an objective standard of reasonableness; and (2) this deficiency prejudiced the defense because in its absence a different result was reasonably probable. *Evans*, 186 Ill. 2d at 93. To overcome the latter prong, the defendant must show a differing result was sufficiently probable as to undermine confidence in the outcome of the proceeding, thus rendering the trial result unreliable or fundamentally unfair. *Evans*, 186 Ill. 2d at 93. Both the performance and prejudice prongs must be satisfied for the defendant to prevail in an ineffective assistance claim. *People v. Sanchez*, 169 Ill. 2d 472, 487 (1996).

Here, the lead opinion did not address the second prong of the *Strickland* test because it concluded defendant failed to satisfy the first prong. Slip op. at 15-16. I believe defendant has met both prongs of the test and begin my analysis with the first prong: whether the failure of defendant's original appellate counsel to appeal the admission of his July 27 and August 16 statements was objectively reasonable. In defendant's first appeal, counsel successfully argued only that defendant's August 15 statement should have been barred under Supreme Court Rule 402(f) as part of plea-related discussions. Appellate counsel never challenged the admissibility of the other two statements.

I

As the lead opinion notes, not all statements "made in the hope of gaining concessions are plea-related statements under Rule 402(f)." Slip op. at 19. I agree as well with that opinion's recitation of the factors relevant to a determination of the objective reasonableness of a defendant's subjective expectations, namely, the nature of the statements, the defendant's audience, "and most importantly here, what the parties to the conversations actually said." See slip op. at 20. I disagree, however, with the application of these factors and the characterization of the testimony in this case by the lead opinion and the special concurrence.

In my view, these analyses apply Rule 402(f) far more narrowly than this court intended in *People v. Friedman*, 79 Ill. 2d 341, 351-52 (1980). In doing so, they unduly limit the rule's application only to

˘45˘

those statements constituting the skeletal offer to plead and those stating potential plea terms. In contrast, in *Friedman* this court recognized that the Rule also broadly encompasses the parties' *plea-related* statements. *Friedman*, 79 Ill. 2d at 351-52. Before examining these analytical differences in depth, I present the relevant testimony.

The pretrial hearing on defendant's motion to suppress spanned several days and included a great deal of pertinent testimony. In addition, there was extensive related testimony presented at trial, including significant evidence supporting defendant's claim that he attempted to initiate plea negotiations at the July 27 interview and made additional plea-related statements on August 16. The determination of whether a particular statement is plea-related must be made on a case-by-case basis, making the specific evidence offered critical to the analysis in this case. *People v. Friedman*, 79 Ill. 2d at 351-52. For this reason, I set forth much of the relevant testimony *verbatim*.

During his pretrial testimony, Officer Young acknowledged that defendant would "set down some guidelines or whatever that he felt was [*sic*] fair to him, that he would like to see happen." More specifically, Young's testimony revealed that on July 12, 1993, defendant "indicated to [Young] that he didn't believe it was first degree murder, that the most it could have been would be concealment of a body and so forth, things of that nature." This testimony establishes that even on that early date defendant was discussing with the police his beliefs as to the appropriate charges.

Young's subsequent testimony demonstrates that defendant's July 27, 1994, interview unequivocally contained the rudiments of a plea negotiation:

> "Q. *** [A]t that time [July 27] [defendant] had–he had told you, for instance, he would be willing to plead to Involuntary Manslaughter and so forth, correct?*
>
> A. I'm not sure if it was on that date or a date after that to be honest with you.
>
> Q. Do you have your report right there?" (Emphasis added.)

After locating the relevant portion of Young's report, the critical testimony concerning the July 27 interview continued:

> "A. Yes, that would be–if I could, please. I believe you're

correct on that, I just wanted to be sure.

Q. Sure.

A. *Yes, sir, that is correct.*

Q. Okay. And on that occasion he would, for instance he said, you know, the most he thought it could be is Involuntary Manslaughter or concealment, correct?

A. Yes, sir, that's correct.

Q. And that *he wanted you to convey to the State's Attorney that he'd accept a ten year sentence and no more, correct?*

A. Yes, sir, that's correct.

Q. And that *he wanted it to run concurrent with the federal charges he was facing, correct?*

A. I believe that's correct, yes, sir.

Q. And he wanted you to convey these things to the State's Attorney I believe, correct?

A. That's correct.

Q. Okay. *And you advised him that you would do that and you would get back to him, correct?*

A. I remember telling him we couldn't negotiate anything with him.

Q. Right.

A. *But I do remember that I told him we would go back to our boss* and, which at that time was Sergeant Conway, *and convey that to him and–*

Q. *And you told him you would convey it to Mr. Kelley, Patrick Kelley, with the State's Attorney's Office, correct, also and get back to the Defendant?*" (Emphasis added.)

After being directed to the appropriate page of his report, Young stated affirmatively: "*A. Yes, sir, that is correct, that's in my report.*" (Emphasis added.)

These facts alone establish that defendant was attempting to enter into plea negotiations at the July 27 interview by offering specific charges and sentencing terms acceptable to him. In addition, Young's testimony demonstrates that at that time the police agreed to convey messages to the State's Attorney on defendant's behalf in furtherance

of his negotiation efforts.

Officer Young also provided support for these conclusions in his subsequent testimony concerning his August 3 interview of defendant. He confirmed that during that interview defendant again brought up his desire to negotiate a plea for a 10-year sentence as well as his request that his offer be conveyed to the State's Attorney. *Defense counsel asked whether Young "had always advised [defendant] that [Young] would provide the information and so forth to the State's Attorney's Office," and Young answered, "Yes, sir, that's correct."* (Emphasis added.) The questioning then returned to a discussion of the July 27 interview:

> "Q. Okay. And just briefly as far as a note that–do you recall a note you were to give to the State's Attorney's Office from [defendant]?
>
> A. I remember when we met with Sergeant Conway after having *[sic]* **coming back from the taped [July 27] interview** *with [defendant] that we told Sergeant Conway about* **[defendant] wanting to try to negotiate some terms** *for – for himself*, and *Sergeant Conway requested I believe that when we returned to have [defendant] read the transcript and that we ask him I believe to put it into writing as to what he wanted or what he was wanting to say, and I do believe that he–[defendant] did do that*." (Emphasis added.)

Notably, *all* the relevant testimony given by other police witnesses verified that they did, in fact, return on August 15 to have defendant put his prior oral offer in writing, lending further credibility to Officer Young's account of *all* the events that transpired during the July 27 interview. The officer's testimonial account was not limited to the official statements defendant memorialized on the audio tape recording relied on by the lead opinion and the special concurrence. The testimony establishes that the July 27 interview consisted of far more than defendant's taped statement or even the discussion that took place when the taping was temporarily interrupted.

It is also noteworthy that Officer Young's testimony was given in June 1996, nearly two full years after defendant made the July 27 and August 16 statements. After such a passage of time, witnesses' memories can fade and lose the specific detail critical to the

determination in this case. After reviewing his official reports, drafted contemporaneous to the interviews, however, Officer Young's testimony concerning defendant's negotiation efforts was unequivocal. When viewed in its entirety, this testimony, as confirmed by the officer's own timely reports, establishes that, at least by the time of the July 27 interview, defendant was attempting to negotiate a plea with the State's Attorney's office and that the police agreed to act as his conduit for information. This evidence establishes that defendant's July 27 statements were a "plea-related discussion" under Rule 402(f).

Additional support for the claim that defendant's July 27 statements were plea-related comes from the testimony of Detective Williamson, who was also present during that interview. He stated that prior to the interview defendant had requested "a note" from the State's Attorney's office concerning the penalties for various homicide charges as well as the presence of two tape recorders during the interview. Detective Williamson testified he and Detective Young complied with defendant's requests. Thus, the evidence shows that defendant asked in advance for information about the possible charges and penalties he was facing, and, at the July 27 interview, stated he was willing to plead guilty to involuntary manslaughter or concealment in return for a maximum 10-year sentence to run concurrently with his federal prison term. In addition, he provided a statement intended to show he was not culpable of first degree murder. These factors neatly fit the mold of a conscious plan to enter into plea negotiations at that time, and in fact, the testimony establishes that all the parties involved then believed defendant was attempting to negotiate a plea.

The special concurrence, however, chooses to examine the various interviews solely as separate events, disrupting the continuity of the negotiation process begun at the July 27 interview. As it notes, evidence also exists showing that defendant offered to plead guilty on August 3 after reviewing the transcript of his July 27, 1994, statement. Slip op. at 35 (McMorrow, J., specially concurring, joined by Freeman, J.). From this evidence, the special concurrence infers a conflict regarding when the guilty plea first occurred. I believe there is no necessary conflict. The defendant's additional negotiation attempt on August 3 does not negate or call into question the validity of the prior July 27 testimony clearly showing the plea issue was

broached then as well. As various officers' testimony established, defendant raised the plea issue on numerous occasions.

Rather than viewing the series of police interviews as unrelated entities, I recognize the inherent interrelationship between defendant's various negotiation attempts, as did the police at the time of the interviews. By considering each discrete interview as disparate from the others, however, the special concurrence attempts to acknowledge the evidence showing that "at some point during the defendant's meeting with police on this date, defendant *tried to elicit from the officers an agreement* that defendant's actions constituted some offense other than murder and that he should be charged with some other offense" (emphases added) (slip op. at 38 (McMorrow, J., specially concurring, joined by Freeman, J.)), while ultimately concluding his statements were independent admissions (slip op. at 44 (McMorrow, J., specially concurring, joined by Freeman, J.)).

I find it hard to characterize defendant's admitted attempt to "elicit ** an agreement" from the police as anything other than an offer to plead guilty to a lesser charge, particularly in light of his contemporaneous reference to a possible set of sentencing terms. As the previously quoted transcript excerpts establish, both defendant's offer to plead to a lesser charge and his specification of acceptable sentencing terms on July 27 are readily apparent from the record. The police themselves believed that defendant was attempting to negotiate a plea. Under those circumstances, I cannot dismiss the statements defendant made during that interview addressing his involvement in Dr. Dickerman's death and the disposal of the body as "independent admissions" or mere offers to cooperate.

The context of defendant's statements shows they were intended to support his efforts to negotiate a plea to some charge other than first degree murder. It is difficult to envision why such a purportedly savvy defendant would make those types of statements unless, in fact, he made them in support of his attempt to negotiate a plea. We must not forget that Rule 402(f) does not preclude the admission of only statements directly offering to plead guilty or present possible terms and conditions for a plea agreement. Rather, it broadly encompasses *all plea-related discussions*, including statements supporting the defendant's desired disposition of the criminal case . See 177 Ill. 2d R. 402(f); *Friedman*, 79 Ill. 2d at 352-52 (noting that plea-related

statements are inadmissible under Rule 402(f)). Read in context, I do not believe the statements concerning defendant's involvement in this case can be dismissed as "independent admissions."

I also cannot agree with the special concurrence's insistence that the requirement of a prefatory offer does not conflict with our instructions in *Friedman*. Slip op. at 28 (McMorrow, J., specially concurring, joined by Freeman, J.). Indeed, *Friedman* prominently discussed the absence of a need for a "preamble" before a discussion may be deemed plea-related. *Friedman*, 79 Ill. 2d at 352. As we explained there:

> "*Nor can we agree that the parties must be seated at the negotiating table before our rule applies. A statement made as an offer to enter negotiation is indistinguishable from a statement made at an advanced stage of the negotiation process* in terms of its impact upon a jury. Statements related to either stage of this process are equally devastating in the trial of the accused. ***In determining whether a statement is plea related, we do not require 'a preamble explicitly demarcating the beginning of plea discussions'*** [citation]. *But where a preamble is delivered, such as defendant's inquiry related to 'making a deal' in the present case, it cannot be ignored. [Citation.] This is a clear indication of defendant's intent to pursue plea negotiations*." (Emphasis added.) *Friedman*, 79 Ill. 2d at 352.

Given our clear statement in *Friedman*, I cannot reconcile the special concurrence's requirement of a prefatory offer with our precedent. Finally, I find that the conflicting testimony in the evidence is far from conclusive in establishing that defendant made negotiation attempts only *after* making the statements at issue

The special concurrence also concludes that "*one* of defendant's motives for requesting the meeting was to learn what the police knew about his involvement in Dr. Dickerman's disappearance and what the police knew about the case of Dr. Dickerman's death." (Emphasis added.) Slip op. at 39 (McMorrow, J., specially concurring, joined by Freeman, J.). While that may well have been *one* of defendant's motives in meeting with the police, he could easily have held additional motives, such as a desire to enter into plea negotiations. Indeed, the latter possibility is supported by his advance request for

information on the possible charges and penalties as well as his subsequent actions during the interview, laying out acceptable terms and condition. These actions demonstrate a plan to pursue negotiations. I also note that neither Rule 402(f) nor any cited precedent precludes a finding that a defendant was attempting to negotiate a plea merely because he is motivated by self-interest and a desire to obtain the best possible deal. Those motivations presumably underlie the negotiation efforts of most, if not all, defendants. Even if defendant wished to obtain additional information from the police, it does not negate his simultaneous intent to negotiate a favorable plea. The record is clear that the police who conducted the interviews understood that defendant was attempting to negotiate a plea. Indeed, the detectives acknowledged that they had a mutual understanding with defendant and that they agreed to "run the options by the State's Attorney." The testimony on this point is further supported by their actions. Although they initially informed defendant they could not make a deal themselves, they told him they would relay information to the prosecution to expedite the negotiation process and ultimately did so.

Moreover, only "*[w]here a defendant's subjective expectations are not explicit*, [do] the objective circumstances surrounding defendant's statement take precedence in evaluating defendant's subsequent claim that the statement was plea-related." *Friedman*, 79 Ill. 2d at 353. Here, I believe the evidence readily supports the conclusion that *defendant's subjective expectations were explicit*. The testimony shows that on July 27 defendant asked the police to take his specified terms and conditions for a possible plea agreement to the prosecutor for review. That is an explicit expression of a plea offer. In light of the transcript, I reject the lead opinion's characterization of the evidence of a plea offer as minimal, consisting of only "veiled references of an offer" (slip op. at 17 (McMorrow, J., specially concurring, joined by Freeman, J.)) and "only vague references to offers to bargain" (slip op. at 19 (McMorrow, J., specially concurring, joined by Freeman, J.)).

Even if defendant's expectations are viewed objectively, however, they remain reasonable under the totality of the circumstances. The record indicates that the police contacted defendant's family in Indiana the month before the July 27 interview and told them that if he was not culpable of murder, he should contact them. With the

knowledge that he would soon be charged with murder, defendant asked for information about possible charges and applicable penalties and requested a meeting, ultimately scheduled for July 27. At that meeting, he talked to police about the investigation, and he gave them a list of acceptable charges and sentencing options. The testimony establishes that the police essentially agreed to act as a liaison to the State's Attorney and to convey these express terms for defendant. Furthermore, at the time they accepted this role, they believed defendant was attempting to conduct plea negotiations. Objectively viewed at the time of the statements, the parties' interchange is a plea-related discussion under Rule 402(f).

As for defendant's August 16 statements, Detective Cox testified that he believed that defendant had a subjective expectation that he was negotiating a plea. He succinctly stated that "defendant attempted *to negotiate terms* for himself" (emphasis added) *at each of the interviews conducted on August 3, August 15, and August 16*. Detective Cox's testimony restated with absolute clarity that defendant had been attempting to negotiate plea terms with the State, that the police recognized those attempts as plea negotiations, and that they had been conveying information in furtherance of that effort. The record shows that, after determining Detective Cox had interviewed defendant on August 3, August 15, and August 16, defense counsel specifically inquired into defendant's negotiation attempts:

> "*Q. And all of those occasions [August 3, August 15, and August 16] [defendant] would indicate and **tell you he would like to work out a deal** and so forth, correct?*
>
> *A. Yes.*
>
> *Q. And he was **attempting to negotiate** with you, correct, or the detectives or at least to **have you convey that to the State's Attorney's Office**?*
>
> *A. Yes.*
>
> *Q. And he was informed that in fact what he had told you and so forth and the **deal he was proposing would in fact be conveyed to the State's Attorney's Office**, correct?*
>
> *A. Yes.*
>
> Q. And basically he was–*you were here when Detective Young testified, he was **proposing a deal whereby** he would*

*be **sentenced to ten years** concurrent on a federal charge, correct?*

  *A. Yes*." (Emphasis added.)

As the lead opinion notes, the most important factor in determining whether defendant's July 27 and August 16 statements were plea-related is "what the parties to the conversations actually said." See slip op. at 20. Here, the record is replete with testimony that defendant repeatedly evinced an obvious and explicit desire to negotiate that was understood by everyone, as well as an expectation that his negotiation efforts would be conveyed to the State's Attorney. The police substantiate that expectation by readily agreeing to transmit information and messages between defendant and the State's Attorney in furtherance of defendant's negotiation effort. *At each of the interviews* held on July 27, August 3, August 15, and August 16, the police witnesses stated that defendant was trying to negotiate a deal and that the officers agreed to participate in the process by relaying information for him. Even the prosecution recognized these negotiation attempts in its closing argument to the jury. The record in this case amply demonstrates that the parties to the conversations at issue here understood that defendant was attempting to negotiate a plea and verbally agreed to participate in that effort, defendant by specifying initially acceptable terms and the police by acting as the State's Attorney's liaison by conveying those terms and any responses. Defendant's statements during the July 27 and August 16 interviews flowed from defendant's subjective beliefs as bolstered by that mutual understanding. See *Friedman*, 79 Ill. 2d at 353 (requiring merely the "rudiments of the negotiation process, *i.e.*, a willingness by defendant to enter a plea of guilty in return for concessions by the State"). His repeatedly expressed desire to "make a deal" cannot properly be ignored. *Friedman*, 79 Ill. 2d at 353.

Furthermore, the special trip the police made to Big Muddy Correctional Center on August 15 to obtain a written copy of defendant's prior oral statement would demonstrate to an objectively reasonable person that this defendant was, at a minimum, led by the police to believe he was, in fact, conducting negotiations with the State's Attorney through his discussions with the officers.

The serving of a murder warrant on August 16 did not necessarily alter defendant's expectations or its objective reasonableness. From a

practical standpoint, the issuance of a charge is not the necessary end to all negotiations. In some instances and for a variety of reasons, plea negotiations may continue or even start after a charge is filed. Moreover, even though the police served defendant with a murder warrant, both detective Williamson and Cox testified their purpose in going to see defendant that day was "to interview" him. In fact, Detective Cox admitted at trial that on August 16 he was "saying to [defendant] basically *tell us why it's less than First Degree Murder*" and "*wanted [defendant] to explain it in his words why it was less than First Degree Murder \*\*\**." Cox also testified that he showed defendant a book of statutes defining various homicide charges during the session. This fact was verified by Detective Williamson, lending credence to defendant's assertion that the parties were still conducting negotiations even though the warrant was served during the interview. Under these circumstances, I conclude that defendant's expectations that he was continuing to pursue plea negotiations on August 16 were objectively reasonable. Overall, I believe the facts support the conclusion that defendant had a subjective expectation of conducting plea negotiations on July 27 and August 16 and that this expectation was objectively reasonable under the totality of the surrounding circumstances.

## II

In addition to differing in my characterization and application of the facts in this case, I also disagree with the lead opinion's interpretation and application of this court's recent opinion in *Hart*. I strongly believe the factual differences between *Hart* and the instant case are striking and compel the suppression of defendant's statements here. First, as the lead opinion accurately states, *Hart* stands for the proposition that " 'mere offers to cooperate' " are not excluded unless they are accompanied by " ' "the rudiments of the negotiation process." ' " Slip op. at 17, quoting *Hart*, 214 Ill. 2d at 504, quoting *Friedman*, 79 Ill. 2d at 353. Here, Officer Young's testimony and contemporaneous report establish that defendant was attempting to enter into plea negotiations at the July 27 interview and specified acceptable terms at that time, distinguishing this case from the mere offer of cooperation established in *Hart*.

Second, the lead opinion states that *Hart* "*held* that because the

defendant did not request that the detective initiate contact or convey terms to the prosecutor or, alternatively, specify the terms he would require in exchange for pleading guilty, the rudiments of the negotiation process were not present, thereby rendering the defendant's statements admissible." (Emphasis added.) Slip op. at 17, citing *Hart*, 214 Ill. 2d at 511-12. While I agree that the *absence of a request by the defendant* was important in that case because it provides critical factual background for the court's ultimate Rule 402(f) determination, the necessity of a request does not constitute a holding of this court. The absence of a request to involve the prosecutor was one factor in our decision that Rule 402(f) did not apply. It was not the sole determinant. We did not hold that defendants must make that specific request before their plea-related discussions will be held inadmissible under the Rule. The totality of the circumstances is still the controlling standard in that determination.

Applying that standard here, I note that this case presents exactly the opposite factual scenario from *Hart*. Here, the police testified both before and during trial that defendant *did* ask them to contact the prosecutor, *did* attempt to convey possible plea terms to the prosecutor, and *did* concretely identify the terms he desired. Contrary to the lead opinion's assertion that defendant made only "veiled references of an offer" and that the even the existence of an offer was unclear (slip op. at 17), the record establishes that defendant made an express offer to negotiate a plea bargain, going so far on July 27, 1994, as to specify verbally the charges and sentencing conditions he was willing to accept.

Even the State's closing argument in the first trial specifically relied on defendant's attempts during the police interviews to negotiate a deal whereby his release from prison for the homicide would coincide with his release on his forgery conviction. These facts again distinguish this case from *Hart*, where the court relied on the prosecutor's failure to ever "state[ ] or impl[y] that defendant offered to enter into 'plea negotiations' or 'plead guilty,' which is what Rule 402(f) is intended to prohibit." *Hart*, 214 Ill. 2d at 512. Here, defendant's statements, made as part of his acknowledged attempts to negotiate a plea, *were* used against him in closing arguments in contravention of the purpose at the heart of Rule 402(f).

Thus, unlike *Hart*, where this court relied on the absence of any specific evidence that the defendant actually attempted to negotiate a plea, this case is replete with such evidence. This critical factual difference readily distinguishes this case from *Hart*. The testimony here undeniably established "the rudiments of the negotiation process" (*Hart*, 214 Ill. 2d at 511; slip op. at 17), mandating a differing result, namely the exclusion of defendant's plea-related July 27 and August 16 statements.


### III

Although the lead opinion hypothetically accepts "defendant's assertion that he conveyed some offer to bargain on July 27,1994, and August 16, 1994," and proceeds to the next step of its analysis (slip op. at 17), it then falters again, this time in its interpretation and application of *Friedman*. I begin with the lead opinion's interpretation of *Friedman*.


### A

The lead opinion concludes that *Friedman* held "that no other possible purpose for the defendant's statement existed [apart from plea negotiations]" (slip op. at 17), but this assertion is unsupported by the text of that opinion. *Friedman* is entirely silent on the possible purposes for the defendant's statement, stating only that the court did not "question *** the reasonableness of defendant's expectations under the circumstances." *Friedman*, 79 Ill. 2d at 352-53. The opinion provides absolutely no explanation for that conclusion, and there is no definitive basis for divining one now. The actual explanation could be as simple as the parties' failure to argue the objective reasonableness of the defendant's expectations. Regardless of the true reason, the absence of *any* examination of the "possible purposes" underlying the defendant's statement cannot be properly extrapolated into the conclusion that the *Friedman* court *held* the bare assertion before it was made solely for the express purpose of plea negotiations. See slip op. at 17. While that presumptive "holding" makes it possible for the lead opinion to distinguish *Friedman* conceptually from this case, it is based on pure speculation and cannot legitimately be used to differentiate the two cases.

The lead opinion makes another interpretive error by advancing

˘57˘

the proposition that *Friedman* "considered the admissibility of a bare offer to plea [*sic*], nothing more" (slip op. at 17), contrasting it with the more robust statements made by defendant here. My examination of *Friedman* reveals it does not limit the exclusionary effect of Rule 402(f) to bare plea offers. Indeed, that proposition would be contrary to common sense and to the language of both the rule and *Friedman*. Application of the rule is not restricted to bare plea offers. The rule precludes the admission of both "plea discussion[s]" and "any resulting agreement, plea, or judgment." 177 Ill. 2d R. 402(f). True to the breadth of the rule's scope, *Friedman* even broadly refers to the defendant's bare offer as "a plea-related *discussion*." (Emphasis added.) *Friedman*, 79 Ill. 2d at 352. Surely Rule 402(f) cannot stand for the proposition that a bare offer to plead is inadmissible while more detailed plea discussions are properly admitted. By attempting to distinguish *Friedman* based on the depth of the parties' plea-related discussions, the lead opinion unnecessarily restricts the application of Rule 402(f) and conflicts with this court's intent in adopting that rule.

As we explained in *Friedman*, "[t]he purpose of our rule is to encourage the negotiated disposition of criminal cases through elimination of the risk that the accused enter plea discussion at his peril [Citations.] To accomplish this purpose, the boundaries of our rule must of necessity be delineated in relation to the reasonable expectations of the accused at the time the statement was made." (Emphasis added.) *Friedman*, 79 Ill. 2d at 351.

"A statement made as an offer to enter negotiation is indistinguishable from a statement made at an advanced stage of the negotiation process in terms of its impact upon a jury. Statements *related to* either stage of this process are equally devastating in the trial of the accused." (Emphasis added.) *Friedman*, 79 Ill. 2d at 352. Although statements deemed inadmissible under the rule must invoke the "rudiments of the negotiations process" (*Friedman*, 79 Ill. 2d at 353; *Hart*, 214 Ill. 2d at 504), it does not logically follow that statements encompassing more than the bare rudiments of negotiation may be admitted. More elaborate statements are inadmissible if they are "related" to plea discussions. See 177 Ill. 2d R. 402(f) (stating "[i]f a plea discussion does not result in a plea of guilty, *** neither the plea discussion nor any resulting agreement, plea, or judgment shall be admissible against the defendant in any criminal proceeding"). See also *Friedman*, 79 Ill. 2d at 351 (recognizing that

"plea-related statements" are protected under the rule).

I believe *Friedman* is misapplied again in the lead opinion's comparison of the circumstances surrounding defendant's August 15 written statement, previously excluded under Rule 402(f), to his July 27 and August 16 statements. That section appears to assert that defendant's August 15 statement was inadmissible because it was made at the behest of the police, who "visited defendant for the sole purpose of obtaining defendant's handwritten version of the events for the State's Attorney's review" "for the sole purpose of negotiations." Slip op. at 20. Thus, according to the lead opinion, defendant's oral statements on July 27 and August 16 statements, unlike his written August 15 statement, were properly admitted because they were "unsolicited" offers not made "at the direction of the detectives." See slip op. at 20.

While this recitation of the record is facially accurate, the lead opinion's subsequent conclusion suffers from two fatal flaws. First, it ignores the additional fact that defendant had already orally given the police the same terms as those contained in the August 15 writing. As the police witness acknowledged, defendant gave the earlier oral statement with the mutual understanding that it would be conveyed to the prosecutor as part of plea negotiations. The accuracy of this depiction of the parties' understanding is amply demonstrated by the return of the police on August 15 at the behest of the prosecutor to get the statement in writing. Second, by overlooking the ongoing nature of the plea discussions in this case as well as the police's vital role as a voluntary messenger and focusing instead on the plans and motives of the police and the State's Attorney, the lead opinion errs by effectively making *the subjective intentions of the police and the State's Attorney the key determinants of the objective reasonableness of defendant's expectations*. Nothing in our precedent supports that rationale.

That approach turns the proper analysis on its head and again leads to a direct conflict with *Friedman*. In *Friedman*, not only were the inadmissible statements entirely unsolicited (*Friedman*, 79 Ill. 2d at 350, 352), but they were made to a person the defendant knew was an investigator on the case and whom defendant had previously spoken to on a number of occasions (*Friedman*, 79 Ill. 2d at 350). The same can be said in the instant case. This court has also explicitly

declared that the key to delineating the boundaries of Rule 402(f) is "the reasonable expectations of the accused at the time the statement was made." *Friedman*, 79 Ill. 2d at 351. Therefore, it is manifestly erroneous to use the purely *subjective* intentions of the police and the prosecutor to determine the *objective reasonableness* of defendant's expectations. Nonetheless, that is the approach adopted in the lead opinion.

B

I also dispute the lead opinion's broad references to defendant's statements as "exculpatory" and designed to "exonerate" him. Slip op. at 20. To that extent, I agree with the special concurrence's discussion of that portion of the lead opinion. Slip op. at 27 (McMorrow, J., specially concurring, joined by Freeman, J.). Furthermore, I reject the role those references play in the lead opinion's analysis.

Rule 402(f) provides, in pertinent part:

> "If a plea discussion does not result in a plea of guilty, *** neither *the plea discussion* nor any resulting agreement, plea, or judgment shall be admissible against the defendant in any criminal proceeding." (Emphasis added.) 134 Ill. 2d R. 402(f).

Nowhere in the express language of the rule is there a requirement that to be inadmissible statements must be inculpatory. Conversely, nowhere in the rule is there a limitation that "purely exculpatory" plea-related statements may be deemed outside its scope.

Under the plain language of Rule 402(f), statements constituting any part of a "plea discussion" are barred from admission. The majority's resort to this "inculpatory/exculpatory" distinction to bolster its conclusion that defendant's statements were properly admitted is not supported by either the language of the rule or *Friedman*.

In *Friedman*, this court used the rule's broad term "plea-related discussion" in its analysis and correctly applied it to minimal statements at issue in that case. *Friedman*, 79 Ill. 2d at 352-53. In those statements, the defendant did not admit his guilt of the charged offense or even provide evidence that he had committed *any* crime, yet the statements were held to be inadmissible under the purposefully broad reach of Rule 402(f). See generally *Friedman*, 79

Ill. 2d at 351 (explaining that "[i]mplicit in the promulgation of this rule was our recognition of the significance of the negotiation process to the administration of justice [citation] and our appreciation of the devastating effect of the introduction of plea-related statements in the trial of the accused [citation]. The purpose of our rule is to encourage the negotiated disposition of criminal cases through elimination of the risk that the accused enter plea discussion at his peril"). I cannot find any basis for making a distinction between the admissibility of statements based simply on the inculpatory or exculpatory nature of their contents under either Rule 402(f) or *Friedman*, nor can I support the application of that distinction here.

### C

In addition to my differing legal analysis of *Friedman*, I disagree with the lead opinion's application of that case to the facts here. Thus, I engage in a brief comparative analysis of factual aspects of the two cases. My review will necessarily be brief because my prior discussion has noted a myriad of similarities between the facts in *Friedman* and this case. While the circumstances surrounding each case must be evaluated to determine whether the discussion was plea-related, I assert that the facts in this case are far more similar to those in *Friedman*, where the defendant's statements were held to be inadmissible under Rule 402(f), than to *Hart*, where the defendant's statements were admitted because they did not constitute even the bare rudiments of the negotiation process.

In *Friedman*, this court found the defendant's statements inadmissible despite the defendant's knowledge that he was speaking to an investigator rather than the State's Attorney when he made the statements. The defendant's knowledge of the listener's identity was established because he had initially called the investigator himself and left a message requesting a return call on "a 'very urgent' matter." *Friedman*, 79 Ill. 2d at 350. Further emphasizing the defendant's knowledge of the investigator's identity, the same individual had previously interviewed the defendant approximately three times earlier.

Similarly, in this case the extensive series of interviews and other contacts between the police and defendant undeniably establish defendant's knowledge that he was not dealing with the State's

Attorney when he attempted to negotiate. This knowledge, however, does not constitute an impediment to finding defendant's statements to be plea attempts any more than it did in *Friedman*, where the circumstances were analogous.

Moreover, the investigator in *Friedman* informed the defendant he had "no control over" defendant's request and even proceeded to identify the appropriate contact person for defendant. *Friedman*, 79 Ill. 2d at 350. Thus, there can be no merit to any protestation that a different outcome is warranted in this case because here the police were not authorized to conduct negotiations. Indeed, the conduct of the police themselves belies their asserted inability to participate in plea negotiations. The police admitted repeatedly relaying messages and information between their supervisor, the prosecution, and defendant. In their testimony, the officers readily acknowledged their role in this communication network as well as their belief that their willingness to convey information to expedite the negotiation process comprised part of the parties' "understanding."

Under these circumstances, as in *Friedman*, I conclude that not only did defendant subjectively believe he was engaged in plea negotiations, but, as in *Friedman*, that those beliefs were objectively reasonable in light of the conduct of the police and the State's Attorney. The officers involved in the interviews testified that they believed that defendant was attempting to conduct negotiations. The prosecutor in the first trial appears to have held a similar belief because he repeatedly informed the jury of defendant's negotiation attempts. Viewed objectively, the combination of the officer's agreement to act as a communication conduit and State's Attorney's use of that conduit indicates the objective reasonableness of defendant's beliefs. A reasonable person in defendant's position would not have known that the officers who have been voluntarily serving as his link to the State's Attorney were behaving disingenuously and actually had no intention of finalizing a plea arrangement.

Although the officers' conduct may have been prompted by the hope of winning defendant's confidence and thereby garnering additional information, that strategy turns the defensive shield created by Rule 402(f) into an offensive sword for the State. Defendants caught in such a strategic twist are not objectively unreasonable for

unwittingly making potentially damaging statements during their negotiation attempts. The injustice of such an investigative strategy is even more manifest where, as here, all the parties involved are fully aware of the defendant's subjective beliefs. Upholding the use of this type of investigatory tactic under those circumstances violates the purpose underlying Rule 420(f), namely, "to encourage the negotiated disposition of criminal cases *through elimination of the risk that the accused enter plea discussion at his peril*." (Emphasis added.) *Friedman*, 79 Ill. 2d at 351.

By failing to recognize that the facts of this case are substantially more similar to those in *Friedman* than to those in *Hart*, the lead opinion and the special concurrence have started this court down a path destined to undermine the fundamental protections intended by Rule 402(f) and upheld in *Friedman*. If this court wishes to follow the lead of our federal courts and limit the reach of our rule, it should do so expressly by changing the language of the rule rather than by unjustifiably narrowing the application of the existing language. I cannot silently countenance the latter approach.

## IV

After reviewing the record, I find appellate counsel's decision to appeal only the trial court's refusal to suppress the August 15 statement inexplicable. In relevant part, defendant's posttrial motion was based on the allegation his statements were inadmissible because they were made during the course of plea negotiations, and the testimony soundly supports that argument.

Defendant's original appellate counsel's failure to appeal the denial of defendant's motion to suppress his July 27 and August 16 statements may have been predicated on an overly narrow reading of defendant's posttrial motion, combined with an inadequate examination of the remainder of the record. In relevant part, defendant's posttrial motion argued "[t]hat the court improperly allowed the State to introduce evidence of *plea discussions* between the defendant and the Springfield Police Department, and, specifically, a note obtained on August 15, 1994, whereby the defendant set forth what plea agreement he would accept to dispose of this cause of action."

Rather than limiting itself to challenging the admissibility of the

August 15 note, as appellant counsel appears to have interpreted it, the motion cites both "evidence of plea discussions" and the August 15 written statement. Notably, the language in the motion refers to plea 'discussions," in the plural, and uses the conjunctive ("and") rather than the disjunctive before "specifically" listing the note. A careful reading of the motion indicates it challenged the denial of defendant's pretrial motion to suppress because the statements were plea-related. Original appellant counsel, however, appears to have focused solely on the August 15 note that was specified in the motion, neglecting to appeal the introduction of the other disputed statements. Regardless of appellate counsel's actual intent, this omission is both inexplicable and unjustified based on a thorough review of the record, indicating that counsel's performance fell below an objective standard of reasonableness.

Cumulatively, defendant's July 27, August 15, and August 16 statements constituted the strongest evidence the State presented against defendant at trial. In addition, appellate counsel should have known the damaging July 27 and August 16 statements would come in again at a new trial unless defendant could avoid the preclusive effects of collateral estoppel by overcoming the heavy burden of showing either special circumstances (see *People v. Enis*, 163 Ill. 2d 367, 386 (1994)) or a violation of fundamental fairness (see *People v. Gaines*, 105 Ill. 2d 79, 91 (1984)).

Although defense counsel possesses broad latitude to choose appropriate legal strategy in each case (see *People v. Fuller*, 205 Ill. 2d 308, 331 (2002)), I can conceive of no legitimate strategic advantage to appealing only one of three damaging, inconsistent statements, given the surrounding circumstances. Thus, I conclude the conduct of defendant's original appellate counsel fell below an objectively reasonable standard of professional performance.

V

Having determined defendant has met the burden of overcoming the first prong of the *Strickland* test, I turn next to the second prong, requiring a showing of prejudice due to counsel's deficient performance (*Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064; *Evans*, 186 Ill. 2d at 93). This determination requires an examination of the effect of the improperly admitted statements on

defendant's trial.

Taken together, defendant's statements undoubtedly constituted a substantial factor in his conviction for first degree murder. Indeed, they were the primary evidence linking him to the death of Dr. Dickerman. The remaining circumstantial evidence alone provides a far more tenuous basis for convicting defendant. Recognizing the importance of defendant's statements, the State heavily emphasized them to the jury during trial.

Moreover, conflicts between the statements undoubtedly prejudiced defendant's case by undermining his credibility as well as his trial claim that he was not involved in any way in Dr. Dickerman's death. The State meticulously used every opportunity to point out to the jury the shifting nature of defendant's account over time and expressly contended during its closing argument that both the evidence and common sense established that defendant was a liar and a schemer. In its closing argument, the State pointed out how over the course of the interviews defendant "fashioned a little bit more of a story, and every time he fashioned and drafted and styled and tailored a new story, it was at odds at what he had said previously." Later, the State explicitly called defendant a liar, sprinkling the details of his various statements into its closing argument for support. Finally, in its rebuttal argument, the State raised the conflicts in defendant's statements by asking the jury whether it was "reasonable to lie [at the first opportunity] and then to lie again and then to in '94 [*sic*], two years later after he already says, 'Oh, I never had anything to do with the forgeries', to lie about that and then plead guilty, and then in 1994 to lie again and to lie again?" Clearly, the State used the variations in defendant's statements to the police to undermine his credibility in a case based exclusively on circumstantial evidence and inferences.

These factors are sufficient to establish that defendant was prejudiced by the admission of his July 27 and August 16 statements, satisfying the second prong of the *Strickland* test. Having found both prongs of the *Strickland* test are met, I conclude defendant's right to effective assistance of counsel was violated in his first appeal and would reverse his conviction and remand the cause for a new trial.

VI

Because I would remand this cause, it is necessary to consider whether retrial invokes double jeopardy concerns. The double jeopardy clause of the fifth amendment to the United States Constitution and the corresponding clause in the Illinois Constitution have been construed in the same manner. *People v. Moss*, 206 Ill. 2d 503, 535 (2003). Both clauses protect criminal defendants against multiple prosecutions for the same offense. *Jones v. Thomas*, 491 U.S. 376, 381, 105 L. Ed. 2d 322, 331, 109 S. Ct. 2522, 2525 (1989). In examining whether there was sufficient evidence to support a conviction in this case, and therefore avoid subjecting defendant to double jeopardy on remand, this court may consider all the evidence submitted at the prior trial, even if it was improperly admitted. *People v. Olivera*, 164 Ill. 2d 382, 393 (1995). Circumstantial evidence must be reviewed under the same standard as direct evidence for this purpose. *People v. Pollock*, 202 Ill. 2d 189, 217 (2002).

Viewing the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt (see, *e.g.*, *People v. Collins*, 106 Ill. 2d 237, 261 (1985)), I would hold the evidence in this case was sufficient. The victim discovered defendant had forged some of his checks and confronted defendant with this information in his home shortly before his disappearance. Drops of the victim's blood were found in the home, and defendant admitted to putting the body in the trunk of the victim's car and disposing of it in Missouri, where it was found. While defendant did not admit to actually killing Dr. Dickerman, there was sufficient evidence for a reasonable jury to find defendant criminally responsible for his death. Thus, double jeopardy considerations are not implicated, and retrial is permissible. See *People v. Fornear*, 176 Ill. 2d 523, 535 (1997).


CONCLUSION

In sum, I would hold defendant's right to effective assistance of counsel was violated by his original appellate counsel's inexplicable failure to appeal the denial of defendant's motion to suppress all three of his potentially damaging statements as part of inadmissible plea negotiations. Counsel's failure to appeal the admission of defendant's July 27 and August 16 statements fell below an objectively reasonable standard of performance. Moreover, the improper admission of the statements prejudiced defendant's case and seriously undermined the reliability of his conviction. For this reason, I would reverse defendant's

conviction and remand the cause for further proceedings. Under this disposition of the case, the other arguments raised on appeal and resolved in the lead opinion would not need to be addressed. Accordingly, I respectfully concur in part and dissent in part.